Patrick C. Dunican, Jr., Esq. (PD - 9401)
Robert C. Brady, Esq. (RB - 4814)
**GIBBONS, DEL DEO, DOLAN,**
**GRIFFINGER & VECCHIONE**
A Professional Corporation
One Riverfront Plaza
Newark, New Jersey 07102-5497
(973) 596-4500
Attorneys For Plaintiff
Days Inns Worldwide, Inc.

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DAYS INNS WORLDWIDE, INC., a Delaware Corporation,<br><br>　　　　Plaintiff,<br><br>v.<br><br>YOGI OF NORFOLK, INC., a Nebraska Corporation; and PIYUSH PATEL, an individual,<br><br>　　　　Defendants. | Civil Action No.<br><br><br><br>**COMPLAINT** |

Plaintiff Days Inns Worldwide, Inc. by and through its counsel Gibbons, Del Deo, Dolan, Griffinger and Vecchione, A Professional Corporation, by way of Complaint hereby alleges as follows:

## PARTIES, JURISDICTION AND VENUE

1.　　Plaintiff Days Inns Worldwide, Inc. ("DIW") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Parsippany, New Jersey.

2.　　Defendant Yogi of Norfolk, Inc. ("Yogi"), on information and belief, is a

corporation organized and existing under the laws of the State of Nebraska, with its principal place of business at 1781 Fleischli Parkway, Cheyenne, Wyoming 82001.

3.      Defendant Piyush Patel ("Patel"), on information and belief, is a principal of Yogi and a citizen of the State of Wyoming, residing at 7207 Tumbleweed, Cheyenne, WY 82009 and/or 1515 W. Lincoln Way, Cheyenne, WY 82001.

4.      This Court has personal jurisdiction over Yogi by virtue of, among other things, Section 23(f) of the October 26, 1992 License Agreement by and between Mr. Patel and DIW (the "License Agreement"), described in more detail below, that was later assigned to Yogi, pursuant to which Yogi has consented "to the non-exclusive personal jurisdiction of the courts of the State of New York and the United States District Court for the Southern District of New York...."

5.      This Court has personal jurisdiction over Patel by virtue of, among other things, the terms of a Guaranty (the "Guaranty"), described in more detail below, pursuant to which Patel consented "to the non-exclusive personal jurisdiction of the courts of the State of New York and the United States District Court for the Southern District of New York...."

6.      Venue is proper in this District pursuant to Section 23(f) of the License Agreement, inasmuch as that provision contains an express waiver by Yogi of any objection to venue in this District.

## ALLEGATIONS COMMON TO ALL COUNTS
## THE AGREEMENTS BETWEEN THE PARTIES

7.      On or about October 26, 1992, DIW entered into the License Agreement with Mr. Patel for the operation of a 61-room guest lodging facility located at 1001

- 2 -

Omaha Avenue, Norfolk, Nebraska 68701, site number 4592-13701 (the "Facility"). A true copy of the License Agreement is attached hereto as Exhibit A.

8.     The License Agreement was later assigned to Yogi pursuant to an Assignment and Assumption Agreement ("Assignment Agreement"), dated January 31, 1997. A true copy of the Assignment Agreement is attached hereto as Exhibit B. Pursuant to the terms of the Assignment Agreement. Yogi "accepts and assumes the rights, benefits and obligations of the Licensee under the Agreements, effective as of the date of this Agreement, including all existing and future obligations to pay and perform under the Agreements. Assignor shall remain secondarily liable for payment and performance of the Agreements."

9.     Pursuant to Section 6 of the License Agreement, Defendants were obligated to operate a Days Inn® guest lodging facility for a twenty-year term.

10.     Pursuant to Section 17 of the License Agreement, Defendants could not lease the Facility, nor engage in any change, assignment, transfer, conveyance, or pledge of its interest, except with DIW's prior written consent. Any attempted transfer, assignment, conveyance, or pledge not in accordance with Section 17 of the License Agreement would be void as between DIW and Yogi, and would give DIW the right to terminate the License Agreement.

11.     Pursuant to Section 19(b) of the License Agreement, DIW could terminate the License Agreement, with notice to Defendants, if Defendants *inter alia* (a) discontinued operating the Facility as a Days guest lodging establishment or (b) lost possession or the right to possession of the Facility.

– 3 –

#1059422 v2
101629-55303

12.    Pursuant to Section 20 of the License Agreement, Yogi agreed that, in the event of a termination of the License Agreement pursuant to Section 19(b) or (c), it would pay liquidated damages to DIW in accordance with a formula specified in the License Agreement.

13.    Section 20 of the License Agreement also provides that liquidated damages will not be less than the product of $2,000.00 multiplied by the number of licensed unit guest rooms" in the facility. This was revised by Section 24(f) to not exceed $1,500 per room.

14.    Pursuant to Section 8(d) of the License Agreement, Yogi agreed to pay interest "at the rate equal to the lesser of 1.5% per month or the highest rate permitted by applicable law on any past due Continuing Fees and other monies" owed to DEW under the License Agreement.

15.    Pursuant to Section 10(e) of the License Agreement, Yogi agreed that if litigation arises from the breach of the License Agreement, Yogi "will reimburse [DIW's] reasonable expenses (including to the extend permitted by applicable law, attorneys' and accountants' fees) of resolving it."

16.    Effective as of the date of the License Agreement, Patel provided DIW with a Guaranty of Yogi's obligations under the License Agreement ("Guaranty"). A true copy of the Guaranty is attached hereto as Exhibit C.

17.    Pursuant to the terms of the Guaranty, Patel agreed, among other things, that upon a default under the License Agreement, they would "immediately make each payment and perform or cause to be performed each obligation of Licensee under the

- 4 -

Agreement."

18.    On or about December 17, 2003, DIW entered into a Satellite Connectivity Services Addendum ("Satellite Agreement") with Yogi. A true copy of the Satellite Agreement is attached hereto as Exhibit D.

19.    Pursuant to Section 7 of the Satellite Agreement it was part of the License Agreement and could be terminated pursuant to the terms therein. In addition, to Section 13(c) of the Satellite Agreement Yogi agreed to pay liquidated damages "of One Thousand Dollars ($1,000.00) within 10 days following the date of termination" of that agreement.

## THE DEFENDANTS' DEFAULTS AND TERMINATION

20.    On or about November 28, 2004, Yogi sold the Facility, without prior consent from DIW, to a third party, LaSalle Bank, NA ("LaSalle").

21.    On or about November 29, 2004, DIW entered into a Temporary Operating Agreement with LaSalle Bank, NA. During LaSalle's ownership of the Facility it was operated by Criimi Mae Services, LP. Although DIW entered into negotiation with LaSalle regarding the execution of a new Licensing Agreement, those negotiations failed.

22.    On or about June 1, 2005, LaSalle sold the Facility to Norfolk Victoria Inns, LLC of Norfolk, Nebraska ("Norfolk"). Norfolk did not enter into a long term agreement with DIW.

23.    By letter dated July 5, 2005, a true copy of which is attached as Exhibit E, DIW acknowledged the termination of the License Agreement, effective June 16, 2005

#1059422 v2
101629-55303

and advised Yogi that it was required to pay to DIW as liquidated damages for premature termination the sum of $91,500.00 as provided in Sections 24(f) and 20 of the Agreement, along with $1,000.00 for early termination of the Satellite Agreement.

## FIRST COUNT

24.    DIW repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 23 of the Complaint.

25.    On June 16, 2005, DIW terminated the License Agreement.

26.    Section 20 of the License Agreement provides that, in the event of termination of the License Agreement due to action of the Licensee, Yogi shall pay liquidated damages to DIW within 30 days of termination.

27.    Section 13(c) of the Satellite Agreement provides that, in the event of termination of the Satellite Agreement, due to action of the Licensee, Yogi shall pay liquidated damages to DIW within 10 days of termination.

28.    As a result of the termination of the License Agreement, Yogi is obligated to pay DIW liquidated damages in the amount of $91,500.00, as calculated pursuant to Section 24(f) of the License Agreement.

29.    As a result of the termination of the Satellite Agreement, Yogi is obligated to pay DIW liquidated damages in the amount of $1,000.00, as calculated pursuant to Section 13(c) of the Satellite Agreement.

30.    Notwithstanding DIW's demand for payment, Yogi has failed to pay DIW the liquidated damages as required in Sections 20 & 24(f) of the License Agreement and Section 13(c) of the Satellite Agreement..

- 6 -

31.    DIW has been damaged by Yogi's failure to pay liquidated damages.

**WHEREFORE**, DIW demands judgment against Yogi for liquidated damages in the amount of $92,500.00, together with interest, attorneys' fees and costs of suit.

## SECOND COUNT

32.    DIW repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 31 of the Complaint.

33.    By virtue of the premature termination of the License Agreement, DIW sustained a loss of future revenue over the remainder of the twenty year term of the License Agreement.

34.    If the Court determines that Yogi is not liable to pay DIW liquidated damages as required by Sections 20 and 24(f) of the License Agreement and Section 13(c) of the Satellite Agreement, then, in the alternative, Yogi is liable to DIW for actual damages for the premature termination of the License Agreement.

35.    DIW has been damaged by Yogi's breach of its obligation to operate a Days guest lodging facility for the remaining term of the License Agreement.

**WHEREFORE**, DIW demands judgment against Yogi for actual damages in an amount to be determined at trial, together with interest, attorneys' fees and costs of suit.

## THIRD COUNT

36.    DIW repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 35 of the Complaint.

37.    Pursuant to the terms of the Guaranty, Patel agreed, among other things, that upon a default under the License Agreement, they would immediately make each

#1059422 v2
101629-55303

payment and perform each obligation required of Yogi under the License Agreement.

38.    Despite their obligation to do so, Patel have failed to make any payments or perform or cause Yogi to perform each obligation required under the License Agreement.

39.    Pursuant to the Guaranty, Patel are liable to DIW for Yogi's liquidated damages in the amount of $92,500.00, or actual damages in an amount to be determined at trial, due and owing under the License Agreement.

**WHEREFORE**, DIW demands judgment against Patel for damages in the amount of all liquidated damages or actual damages due and owing under the License Agreement, together with interest, attorneys' fees and costs of suit.

**GIBBONS, DEL DEO, DOLAN,<br>GRIFFINGER & VECCHIONE**<br>A Professional Corporation<br>Attorneys for Plaintiff<br>Days Inns Worldwide, Inc.

Patrick C. Dunican, Jr., Esq.<br>Robert C. Brady, Esq.

Dated:  February 1, 2007

– 8 –

# **EXHIBIT A**

04592-13701-1015

## LICENSE AGREEMENT

This License Agreement ("Agreement"), dated 10|26, 19 92, is made and entered into between **Days Inns of America, Inc.**, a Delaware corporation ("DIA"), and **Piyush Patel, Individually**, ("Licensee").  In consideration of the mutual promises, covenants and agreements herein, the parties agree as follows:

1.  **Days Inn System.**  DIA owns the right to license, the distinctive "Days Inn System" operated under the "Marks" and "System Standards".  All quoted terms are as defined herein.

2.  **License.**  DIA grants (subject to Licensee's fulfillment of the "Construction Obligation" and to Licensee's compliance with all its other obligations hereunder, including without limitation, payment of all "Continuing Fees" and effective only on the "Commencement Date"), a limited, non-exclusive "License" to operate the "Unit" using the System, but only at the specified "Location" and no other, during the "Term".  Licensee accepts the License and covenants to operate the Unit under the System during the Term pursuant to this Agreement.  The Unit will be designated and will operate under the primary name and Mark "Days Inn", together with a secondary designator assigned by DIA from time to time relating to the location and proximity to a landmark, transportation facility or attraction.  No other name or designation may be utilized by Licensee for the Unit.

3.  **The Unit.**  The "Unit" shall include the land at 1001 Omaha Avenue, Norfolk, Nebraska  68702 (as legally described in Schedule "A", the "Location") and all improvements, structures, furniture, fixtures and equipment (the last 3 collectively, "F/F/E"), appurtenances, facilities, entry/exit rights, parking, amenities, and related rights, privileges and properties existing, to be constructed thereon, or subsequently added during the Term.

4.  **Construction Obligation.**  (a)  Licensee must commence construction by October 20, 1992 and by six months after the "Construction Start Date", Licensee must complete the Unit in accordance with the Construction Obligation and be ready, willing and able to open the Unit for business.  Otherwise, in addition to DIA's rights under Section 19, and subject to the granting of an extension under Section 7, paragraph (c) below, DIA may, at its sole discretion, terminate this Agreement at any time prior to the Commencement Date by giving Licensee written notice thereof if Licensee fails to meet either of the foregoing construction commencement and completion dates.  (b)  If DIA, in its sole discretion, permits Licensee to execute and deliver this Agreement without "proof of land control," then Licensee must deliver proof of land control, satisfactory to DIA, in its sole discretion, within 30 days after the date of this

NINN192

1

04592-13701-1015

Agreement. Licensee must deliver "proof of financing", satisfactory to DIA, in its sole discretion, within 120 days after the date of this Agreement. If Licensee fails to meet either of the foregoing deadlines, then DIA may terminate this Agreement by giving Licensee written notice thereof at any time prior to DIA's receipt of the proof that has not been timely delivered. "Proof of land control" means a copy of a recorded deed to the Location or other documentary evidence satisfactory to DIA showing that Licensee has fee simple title to the Location, or an executory lease of the Location or the Unit for the Term. "Proof of financing" means a copy of any of the following: (i) A lender's commitment letter for construction financing executed and accepted by Licensee, (ii) Fully executed and executory construction or permanent financing documents for the Unit, or (iii) a current statement from a financial institution showing that the funds necessary to build the Unit are on deposit in Licensee's construction financing account. Licensee will, at its expense, create a site plan and detailed architectural plans and specifications (based upon the "Design Standards") tailored to the Location, which must be submitted to DIA. Licensee will not commence (as specified in Schedule B) construction unless and until DIA shall have first given its written approval to such plans and specifications (after approval, the "Approved Building Plans"). Such approval right is intended only to ascertain initial compliance of the submitted plans and specifications with System Standards, and not to detect errors or omissions in the work of Licensees' architects, engineers, contractors or the like. The Design Standards, Schedule B, and the Approved Building Plans, as modified with DIA's prior written approval, collectively define Licensee's "Construction Obligation". Licensee shall give DIA written notice of the date construction commences (the "Construction Start Date"), together with photographic or documentary evidence, such as a copy of a notice of commencement to a lender or a building or excavation permit. Any modifications to or variances from the Construction Obligation require DIA's prior written approval. Licensee shall promptly provide DIA with copies of such permits, job progress reports, and other information as DIA requests, and shall allow DIA to inspect construction while in progress without prior notice. Licensee may utilize the System Standards prior to the Commencement Date only to the extent necessary to comply with the Construction Obligation. Licensee's time to commence and complete construction may be extended in writing by DIA for a reasonable time not to exceed 60 days only because of events beyond the reasonable control of Licensee, such as strikes, materials shortages, fires and acts of God which Licensee, by the exercise of due diligence, could not have avoided.

5.    **Commencement Date.** Operation of the Unit under the System may begin on a date (the "Opening Date") to be selected by Licensee only after DIA gives Licensee a written certificate that Licensee has completed the Unit in accordance with its Construction Obligation, and that the Unit meets, in DIA's sole discretion, all applicable System Standards. The date such certificate is issued shall be the "Commencement Date".

NINN192

04592-13701-1015

6.    <u>Term.</u> The License "Term" commences on the Commencement Date and (unless earlier terminated) automatically terminates on its twentieth anniversary.  This Agreement (as distinguished from the Term of the License) shall remain in effect from and after the date Licensee and DIA execute and deliver this Agreement through the Term and until all of Licensee's duties and obligations have been duly performed or discharged. NEITHER PARTY HAS RENEWAL RIGHTS OR OPTIONS.

7.    <u>Initial Fees.</u>

(a) (<u>Application and Initial Fees</u>)  The Application Fee paid to DIA by Licensee compensates DIA for evaluating the Application.  It is not refundable unless DIA rejects the application because the Unit is too close to a System unit.  An "Initial Fee" of $10,000.00 is due with Licensee's executed copy of this Agreement, and is not refundable, excepting only that if Licensee is prevented from commencing its Construction Obligation due to inability to obtain zoning changes, zoning variances or building permits, condemnation of the Location, or acts of God which will permanently or indefinitely, as determined in DIA's sole discretion, prevent construction completion under Section 4 and DIA terminates this Agreement, then Licensee shall receive a refund of 50% of the Initial Fee actually paid in cash by Licensee, without interest.

(b) (<u>Initial Entry Charge</u>)  The Initial Entry Charge is a Reservation System Fee, payable to DIA for gaining access to the Reservation System, in an amount equal to the lesser of $100.00 per licensed guest room, or $10,000.00.  This Charge is payable in three approximately equal installments due upon execution of this Agreement, and then on the first and second anniversaries of the date of this Agreement.  Licensee will pay the deferred portion of the Initial Entry Charge by delivery and payment of a promissory note in form provided by DIA.  The Initial Entry Charge for the Unit is $4,000.00.

(c) (<u>Extension Fee</u>)  If Licensee requests an extension of the deadline by which it is required to commence construction of the Unit, such request shall be in writing delivered to DIA at least 15 days prior to the deadline and shall be accompanied by the payment of an "Extension Fee" equal to $100.00 multiplied by the number of days extension requested.  DIA will inform Licensee in writing within 10 days after receipt of the extension request whether it will, in its sole discretion, grant the request and accept the Extension Fee, or reject the request and return the Extension Fee, less amounts then due DIA from Licensee under this Agreement or any other agreement with DIA.  DIA's notice of acceptance will automatically amend this Agreement to extend such deadline to the date specified in the notice.  DIA shall have no obligation to consider any extension request unless it is accompanied by payment of the proper amount of the Extension Fee.  DIA will retain the right to terminate this Agreement pursuant to Section 4 during the extension period if DIA receives a license application for a Unit to be located in the general trade territory of the Unit, in DIA's sole

NINN192

3

04592-13701-1015

discretion, in which event DIA will refund to Licensee with the notice of termination the unused portion of the Extension Fee.

8.    <u>Continuing Fees.</u>  Royalties, assessments and interest (collectively, "Continuing Fees") shall accrue monthly and be payable to DIA in U.S. dollars as follows:

(a)  (<u>Monthly Royalties</u>)  For the period commencing on the Opening Date through the first five years of the License Grant Term, a "Monthly Royalty" of 4% of gross revenues attributable to or payable only for rentals of guest rooms at the Unit, including all credit transactions, whether or not collected, ("Gross Room Revenues"), excluding charges for "Food and Beverage", key forfeitures, entertainment, telephone and room service, vending receipts, and federal, state and local sales, occupancy and use taxes, is payable on the tenth day of the following month. Notwithstanding the foregoing provisions, if prior to the expiration of the above mentioned period the Facility receives a Quality Assurance score of less than 400 points, the royalty fee shall immediately be increased to 6.5% of Gross Room Revenues for the balance of the above mentioned period.

(b)  (<u>Monthly Royalties</u>)  For the period commencing on the sixth year of the License Grant Term through the Balance of the License Grant Term, a "Monthly Royalty" of 6.5% of Gross Room Revenues.

(c)  (<u>Reservation System User Fees</u>)  "Reservation Fees," consisting of the charges and fees set forth on Schedule C, including without limitation: a percentage of Gross Room Revenues per month, communications charges, travel agent commissions for travel agent bookings at the Unit if done through the Reservation System, "Airline Automation Charges" per reservation booked through third party computerized reservation systems, are payable monthly after the Commencement Date, as DIA directs, but not later than the tenth day of the month following the month in which billed.  DIA reserves the right to drop or change any fee described in this Paragraph (b), and to add fees for new services, at its sole discretion as to amount or formula from time to time for all Days Inn System units but with at least 30 days prior written notice, to reflect changes in its fully allocated costs of providing Reservation System-related services, and to add, drop or modify the types of reservation services it offers.

(d)  (<u>Taxes</u>)  "Taxes" in an amount equal to any federal, state and local sales, gross receipts, use or similar tax assessed against or payable by DIA with respect to the Continuing Fees, if any (unless the tax is an income tax or optional alternative to an income tax otherwise payable by DIA), is payable within 10 days after receipt of DIA's invoice therefor.

(d)  (<u>Interest</u>)  "Interest" at the rate equal to the lesser of 1.5% per month or the highest rate permitted by applicable law on any past due

NINN192

4

04592-13701-1015

other Continuing Fees and other monies owed DIA under this Agreement
(except interest), accrued from the due date, including without
limitation on amounts discovered to be due in any audit by DIA from the
date such amounts should have been paid, is payable within 10 days after
receipt of DIA's invoice therefor.

(e) (<u>Minimum Annual Royalties</u>) Licensee will pay DIA "Minimum Annual
Royalties" under paragraph (a) of this Section in the amount of
$15,000.00. If the Monthly Royalties paid to DIA, under paragraph (a)
of this Section 8 for each twelve month period ending with the month in
which the anniversary of the Commencement Date occurs is less than such
amount, then within 20 days after the end of each annual period, Licensee
will pay DIA the difference between the aggregate Monthly Royalties paid
during such period and the Minimum Annual Royalties amount. Such amount
will be subject to adjustment on each March 1, beginning March 1, 1992,
by multiplying the $15,000.00 factor by the "Adjustment Factor" (defined
in paragraph (j) of Section 16 of this Agreement), using as the
denominator of such Adjustment Factor the CPI-U for January, 1991.

(f) (<u>Annual Conference Fee</u>) Licensee will pay DIA an "Annual Conference
Fee" annually after the execution of this Agreement and the Unit opens
under the System if DIA schedules an annual franchise conference, upon
receipt of an invoice from DIA, but not later than the tenth day of the
month following the month in which billed. DIA will set the amount of
and bill Licensee for the Fee at least 90 days before the scheduled
opening date of DIA's annual franchise conference, if held by DIA or an
affiliate. The Fee will be the same as the registration fee for the
first conference attendee charged all licensees of DIA and its payment
by Licensee will entitle one representative of the Unit to attend the
annual franchise conference functions. The costs of transportation,
lodging and meals (except those provided by DIA as part of the
conference) for the attendee will be borne by Licensee. Licensee will
be required to pay one Annual Conference Fee regardless of the number
of Days Inn System units owned by Licensee.

9.    **The System.** The "System" means a comprehensive system for the delivery
of transient lodging services which at present includes and in the future
will include as DIA specifically in writing from time to time designates:
the Days Inn System service marks, logos and derivations plus other
logos, names, slogans, commercial symbols, trademarks and service marks
(regardless of whether registered, registerable or existing at common
law), System unit trade dress, and associated business good will
(collectively "Marks"); other intellectual property, including
copyrights, "Confidential Information", "System Standards Manuals", and
know-how; advertising, publicity and other marketing materials and
programs; operating suggestions; training programs and materials and
quality assurance programs; a computerized central room Reservation
System; consulting programs; specifications and policies; and the like;
and (without separate royalty) Food and Beverage and other services, if
any, but only when offered under the Marks in accordance with System

NINN192

Standards. DIA reserves the right, from time to time, by adoption or amendment of System Standards, to add, amend, modify, delete or enhance any portion of the System (including any of the Marks and System Standards) as may be necessary in DIA's sole judgment, to change, maintain, or enhance the Days Inn System trade names or the reputation, efficiency, competitiveness and/or quality of the System, or to adapt to it new conditions, materials or technology, or to better serve the public. Licensee will, at its expense, fully comply with all such additions or modifications reasonably designated as applicable to then existing System licensees.

10.  <u>Proprietary Rights.</u> Licensee acknowledges that DIA licenses the System and that any use of the System, other than pursuant to this Agreement, would cause DIA irreparable harm for which there is no adequate remedy at law, entitling them to injunctive and other relief. Without limiting the foregoing:

(a) (<u>Marks/System Usage</u>) Licensee acknowledges and will not contest the validity of the Marks, and DIA's right to license the System. Licensee may not use, and does not acquire the right to use, the System or any Mark in any signage, advertising, stationery, supplies, linens, china or otherwise except in accordance with this Agreement and the System Standards, or with the prior written approval of DIA. Licensee may not apply for federal, state or foreign registration of the System or any Mark, or use any Mark in its legal or trade name.

(b) (<u>Inurements</u>) All uses, improvements and additions to the System (including any of the Marks) created or acquired by DIA, Licensee or any third party automatically inure to and become the property of DIA, as applicable.

(c) (<u>Other Systems</u>) DIA and its affiliates each reserves the right to own in whole or in part, and to manage, operate, use, lease, sublicense, franchise, license (as licensor or licensee) or joint venture (i) distinctive separate lodging and/or Food and Beverage marks which are not designated as part of the System, and to enter into separate agreements with Licensee and/or others (for separate charges) for use of any such non-System marks, and (ii) other hotels, restaurants and/or businesses, under the System or otherwise (including under third party and other marks) at any location whatsoever.

(d) (<u>Status Notices</u>) DIA may require Licensee to disclose (by signage, letterhead, written disclaimer, posted notice or otherwise) for any purpose, including any so-called state assumed name filing, or private or public offering of securities by or for the benefit of Licensee, that it is a System licensee only and not sponsored by or otherwise affiliated with DIA or their affiliates. Neither Licensee, its principals, nor its employees will represent to any actual or proposed lender, investor, guest, customer, supplier or other person or entity that DIA or their affiliates has an ownership interest in Licensee or the Unit, is or will

NINN192

6

04592-13701-1015

be in any way responsible for Licensee's debts or acts, or is participating in any investment offering.

(e) (<u>Litigation</u>)  Either DIA or DIA may (but is not obligated to), at its option, defend and prosecute, for itself and/or on behalf of the Licensee any personal injury or property damage action naming DIA or DIA as a party. Such control of any action will not limit or change obligations to insure and indemnify DIA and DIA under Section 16. DIA will indemnify and defend Licensee against actual damages and monetary judgments incurred in actions brought by third parties against Licensee alleging infringement of the rights of such parties, by virtue of Licensee's proper use of the System in strict compliance with the System Standards, provided that DIA shall be obligated to defend Licensee in such actions only with counsel of its selection and under its control, and only after Licensee has given DIA written notice of any such action and has provided DIA with complete and accurate information then known by Licensee about the alleged infringement.  Licensee will, at its expense, extend its full cooperation in all such matters.  If such dispute or litigation results in whole or in part from any activity of Licensee in breach of this Agreement, Licensee will reimburse DIA's reasonable expenses (including, to the extent permitted by applicable law, attorneys' and accountants' fees) of resolving it. DIA need not initiate suit against imitators or infringers, and may settle any dispute by grant of a license or otherwise.  Licensee will promptly upon discovery notify DIA in writing of any uses of Marks or names confusingly similar to those included in the System, and any litigation against Licensee related to the System.

(f) (<u>Confidential Information</u>)  Licensee agrees that prior to and during the Term, and thereafter for the lesser of 10 years or the longest time permitted by applicable law, to exercise its best efforts to preserve the confidentiality of any DIA and DIA trade secrets and other proprietary information not generally known in the hospitality industry (collectively "Confidential Information"), including confidential portions of the System Standards Manuals and Confidential Information contained therein or conveyed during training programs. Licensee shall comply with all instructions in the System Standards Manuals for preserving confidentiality of Confidential Information. Licensee shall use Confidential Information only to fulfill the Construction Obligation and then during the Term for the Unit and in furtherance of this Agreement, and will, upon termination of the License (or earlier, as requested by DIA), return to DIA all Confidential Information fixed in any tangible medium of expression (within the meaning of the U.S. Copyright Act), now known or later developed.

11.    <u>System Standards.</u>  DIA and/or DIA shall have the right to control and establish requirements for all aspects of the System, including without limitation for Marks usage, and for Unit construction, decoration, interior and exterior signage, quality assurance and guest service (collectively, the "System Standards") associated with the System.

NINN192

04592-13701-1015

Without limiting the foregoing:

(a) (Specification)  DIA may from time to time specify the System Standards in its "Planning and Design Standards Manual", "Operating Policies Manual", "Purchasing Manual", and such successor and additional manuals as DIA shall put into use from time to time (collectively, and as amended from time to time, the "System Standards Manuals"), or otherwise, including without limitation, standards relating to:  (i) minimum Unit "Quality Standards", which include the Design Standards and other standards for cleanliness, maintenance, supplies, concession types, Food and Beverage service, vending machines, uniforms, staffing, employee training, replacement of F/F/E, decor, and other capital items, guest services, operations, guest comfort and other areas;  (ii) "Mark Standards" for interior and exterior Mark-bearing signage, china, linens, utensils, glassware, uniforms, stationery, supplies, advertising materials and other items, and with the right to specify which and how items used at the Unit or elsewhere shall omit or bear Marks; (iii) "Design Standards" for new, upgraded or modified facilities, including standards for all aspects of unit design, construction materials, landscaping, interior decor, original and replacement F/F/E, operational uniforms, amenities and supplies and the like; and (iv) "Technology Standards" for communications, point of sale terminals and computer hardware and software for various applications, such as rooms management, records maintenance, marketing data, accounting, budgeting and the Reservation System; all of which Licensee agrees to meet, at its sole expense. DIA may, in its sole discretion, permit deviations from System Standards, based on local conditions and/or DIA's assessment of special circumstances.

(b) (Delivery of System Standards Manuals) At the first to occur of the training programs described in Section 14 or earlier in DIA's discretion, and after Licensee and others acting on its behalf execute any confidentiality agreement required by DIA, Licensee will receive on loan from DIA one copy of each of the System Standards Manuals in their then current form. DIA then will add Licensee to its mailing list to receive amendments, replacements and supplements thereto. Licensee shall comply with the System Standards Manuals as amended, replaced and supplemented from time to time.

(c) (Inspections) DIA has the unlimited right to create, implement and modify from time to time a standard inspection scoring system and to conduct unannounced inspections in accordance with such scoring system of the Unit's premises, operations, records and Marks usage both prior to and then during the Term, to ascertain Licensee's compliance with System Standards and other provisions of this Agreement.  DIA's representatives will conduct Unit inspections at such times annually during the Term in accordance with the System Standards in effect from time to time.  Licensee shall pay the travel, lodging and meal expenses of DIA's representatives associated with any reinspection of the Unit necessitated by the Unit's failure to meet Quality Standards on any prior

NINN192

inspection. Licensee acknowledges that all inspections under this paragraph (as well as any review and approval of Licensee's Approved Building Plans and/or the Unit) are solely for the purposes of ascertaining compliance with System Standards. Neither DIA, its affiliates, nor their representatives, agents or contractors assumes any responsibility or liability to Licensee, its lenders, contractors, employees, guests or others by reason of such inspections or approvals.

12.    <u>Reservation System.</u>    DIA, through DIA, its affiliates and/or subcontracting, will, at its expense, maintain (directly or by subcontracting with one or more third parties) a computerized central "Reservation System" with a national toll-free telephone access number and/or such technological substitute(s) and/or supplement(s), as DIA or DIA determines in its sole discretion, for making reservations at System units. Licensee will, during the Term, participate in the Reservation System and comply with all related System Standards set by DIA in its System Standards Manuals or otherwise in writing, including, without limitation, standards for (i) purchase or lease and maintenance of computer/teletype terminal equipment, communications equipment and service, and/or computer hardware and software; and (ii) honoring prepaid, confirmed, guaranteed and other reservations for the Unit accepted through the Reservation System. Licensee shall not use the Reservation System to refer guests, directly or indirectly, to any non-System hotel. Licensee shall be solely responsible for (and shall indemnify and hold DIA harmless against) overbooking of its guest rooms, through the Reservation System or otherwise. Licensee shall pay any and all of the Location's telephone line connection charges, supply costs and other such expenses of participating in the Reservation System. The Unit may be suspended from the Reservation System, receiving no further reservations, without prior notice during any period when Reservation Fees are past due, or if non-standard computer hardware is used by Licensee and such hardware is not able to perform all reservation terminal functions at the time of initial installation or over a specified period thereafter. DIA may, in its sole discretion, after reasonable notice to Licensee, cause Reservation System referrals to the Unit to cease for the duration of any default by Licensee in the performance of its other obligations under this Agreement, and without notice may divert reservations made for arrivals scheduled on or after the date of the default, or if the License is terminated, the date of termination to other System units. Licensee waives all claims against DIA or DIA (or their subcontractors) arising from any proper removal of the Unit from the Reservation System under this Section 12.

13.    <u>Marketing.</u>

(a) (<u>National Advertising</u>) DIA, directly or through its affiliates and at its sole discretion and expense, will implement national advertising and other marketing programs to enhance and promote public awareness and patronage of System units.

NINN192

9

04592-13701-1015

(b) (<u>Directories</u>) During the Term, DIA will provide Licensee with System unit "Directory" copies, at least including the names and addresses of System members. Licensee will prominently display the current edition of the Directory in each Unit guest room, and at such other locations within the Unit as requested by DIA.

(c) (<u>DIA Local Advertising</u>) DIA, directly or through its affiliates and at its sole discretion and expense may implement local advertising and/or marketing programs, which may or may not encompass the Unit.

(d) (<u>Group Bookings</u>) DIA, at its sole discretion, may offer Licensee, through the Reservation System or otherwise, group bookings at the Unit solicited by its national sales force (if any) and charge Licensee fees for such services.

(e) (<u>Licensee Local Advertising</u>) Licensee shall, at its expense, generate a local advertising program, including at least appropriate off-Location and Location signage, beginning after the Commencement Date and not before, except that Licensee may utilize the pre-Commencement Date local advertising and signage program specified in the System Standards Manuals. All Licensee advertising programs and materials must comply with System Standards. DIA shall have the right to compel Licensee to cease using any advertising materials not in compliance with System Standards, or which use out-dated or abandoned graphics or copy.

(f) (<u>Licensee Cooperation</u>) Licensee, at its expense, will cooperate with and participate in such marketing programs as DIA may reasonably request in writing, such as participation in special promotional and frequent traveler programs, marketing programs, marketing research programs, and the display and use of System brochures, Directories and in-room "paper tent" or "flyer" promotional materials.

14.    <u>Training and Consulting Services.</u>

(a) (<u>Minimum Training</u>) Within the times and as set forth from time to time in the System Standards Manuals, DIA, its affiliates or designees shall provide, and employees of the Unit designated by DIA must attend training programs including, without limitation, a hospitality management training program, and a recurrent field training program for Licensee's general manager(s), which must be completed to DIA's satisfaction, at a location designated by DIA and such other training programs as may be mandatory under the System Standards from time to time.

(b) (<u>Optional Property Training Program</u>) If Licensee so elects and subject to DIA's scheduling requirements, DIA designees will provide in the Unit or other agreed location, a "Property Training Program" (at DIA's discretion as to length) to assist the Licensee in preparing for the Opening Date. The Property Training Program will be offered to Licensee at no charge other than for the reasonable expenses for travel, room, board and other out-of-pocket costs of DIA's designees.

NINN192

04592-13701-1015

(c) (<u>Supplemental Training</u>) DIA may, at its sole discretion and expense, from time to time hold special training sessions at a location designated by DIA or other designated location(s) and require attendance of designated Licensee employees.

(d) (<u>Training Expenses</u>)  Mandatory training shall be provided by DIA without tuition charge, except that DIA shall have the option to charge reasonable tuition for Licensee's replacement persons attending under Sections 16, paragraph (b) or 17, paragraph (a), and for cancellation of training program commitments or reservations by Licensee or its employees within 30 days (or such shorter period as DIA may specify) prior to the start of any training program. DIA may charge (i) tuition for optional training other than the Property Field Training Program (including training at mandatory sessions of persons in addition to those required by DIA to receive such training), and (ii) fees for instructional materials. Licensee will bear all travel, lodging, food and other out-of-pocket attendance expenses of its training program attendees.

(e) (<u>Free Consultation</u>) Appropriate, qualified DIA representatives who are at the Unit for compliance inspections pursuant to Section 11, paragraph (c) shall be available during such visits for reasonable Unit operations consultation at no cost to Licensee. In addition, DIA will provide Licensee reasonable Unit operations consultation services by telephone and mail.

(f) (<u>Annual Franchise Conference</u>)  DIA (or an affiliate) may, but is not obligated to, conduct an annual franchise conference, at a location and on a date selected by DIA, covering a program specified by DIA, at its sole discretion.  If such a conference is held, DIA may charge Licensee the Annual Conference Fee as set forth in Section 8 hereof. DIA may provide training and consulting services at the conference. Upon payment of the Annual Conference Fee, Licensee will be authorized to send one unit representative to the conference.  Additional unit representatives may be sent subject to compliance with DIA's conference policies and procedures and after payment of any additional conference fees.

15.   <u>Approved Supplier Lists/Purchasing Services.</u>  DIA shall have the right, at its discretion, to designate in a "Purchasing Manual" services or products of suppliers as "System-Approved", to maintain a "System-Approved Supplier" list of such approved suppliers, and to issue from time to time, in the Purchasing Manual, a catalog or another format, lists of System-Approved Suppliers and/or materials, F/F/E, finishes, supplies, services, and the like which meet System Standards.  DIA or an affiliate will make available to Licensee optional "Purchasing Services", for supplying goods and services, meeting System Standards. Licensee will pay upon receipt all invoices for orders placed by or through Purchasing Services. Licensee is not obligated to use Purchasing

NINN192

04592-13701-1015

Services, or to purchase non-Mark-bearing products or services which otherwise meet System Standards from System-Approved Suppliers. Mark-bearing items shall be purchased only from System-Approved Suppliers. DIA will publish in its System Standards Manuals procedures by which Licensee-selected sources of Mark-bearing items and other things may apply to become System-Approved. Any contract (including its prices, terms and conditions) which results from System-Approved Supplier lists shall be strictly between the System-Approved Supplier and Licensee; and DIA shall not be deemed to be a seller, distributor, title-holder or warrantor of any products or services so purchased. DIA, FOR ITSELF, DIA AND ITS AFFILIATES, DISCLAIMS ALL EXPRESS OR IMPLIED WARRANTIES CONCERNING SYSTEM-APPROVED PRODUCTS OR SERVICES, INCLUDING, WITHOUT LIMITATION, ANY WARRANTIES AS TO MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, AVAILABILITY, QUALITY OR PRICING. Licensee acknowledges that DIA may receive fees, commissions, field of use royalties, or other consideration from System-Approved Suppliers based on their sales to or royalties received from System licensees, whether through Purchasing Services or System-Approved Supplier lists.

16. Additional Licensee Duties.

(a) (Compliance with System Standards)  At Licensee's expense and in accordance with System Standards Licensee will (i) decorate, furnish, equip and maintain in good condition and repair, the Unit (including all common areas, parking facilities, walkways, recreational facilities, amenities and the like at the Location) free from patent defects, discovered latent defects and environmental hazards; and (ii) operate the Unit in a clean, sanitary, safe and orderly manner, providing courteous service and high quality accommodations to the public.

(b) (Management)  Licensee will cause the Unit to be managed by Licensee's employees (or its owners) who have completed to DIA's satisfaction a Hospitality Management Program. If Licensee adds or replaces any Unit manager, it will (at Licensee's expense, including reasonable tuition) send each such new employee to any required training program before, to the extent practicable, otherwise as soon as possible after, the date of first assuming management duties. Licensee may contract with a third party for management of the Unit only with DIA's prior written consent to any management agreement, which at DIA's sole discretion, may be denied or conditioned on the inclusion or exclusion of terms in the management agreement.

(c) (Special Efforts)  Licensee will exercise all reasonable efforts under the circumstances to (i) maximize the good will of the System units, guest satisfaction with, and usage of, the Unit so long as it is operating under the System, and recommend and promote all other System units and activities; (ii) provide Unit guests such complimentary items and services as DIA from time to time reasonably specifies in System Standards Manuals; (iii) recognize and accept for the purpose of identification and credit, all credit or consumer debit cards which DIA

NINN192

now or hereafter specifies in writing; (iv) maintain sufficient working capital and maintenance and renovation reserves to enable it to fulfill its Agreement obligations; and (v) not allow its executive officers, general partners, employees, representatives, or guests to engage in conduct which is unlawful or damaging to the good will of the System.

(d) (<u>Accounting System</u>) Licensee will maintain books and records of the Unit in accordance with the <u>Uniform System of Accounts for Hotels</u>, (8th Rev.Ed. 1986) as amended from time to time, and, as adopted by the American Hotel & Motel Association, or at DIA's option such other uniform system of accounts as DIA may from time to time reasonably specify in writing, and preserve such books and records for at least 3 years from their respective preparation dates (even if after termination of the License).

(e) (<u>Monthly and Other Reports</u>) Licensee will send DIA at DIA's request in each case, on or before the tenth day of each month (or portion thereof), together with payment of all Continuing Fees then due, a written monthly operating report in the form prescribed by DIA (a "Monthly Report"), showing required information (including monthly and year-to-date financial information, occupancy data and average daily room rates), and the computation of all Continuing Fees accruing for the preceding month. Licensee will submit to DIA all such other reports, data and information as DIA may from time to time reasonably require.

(f) (<u>Semi-Annual and Annual Reports</u>) Licensee will send DIA at DIA's request and, in the form prescribed by DIA: (i) within 45 days after the end of the Unit's second operating quarter of any Unit operating year, an unaudited 6 month profit and loss statement and balance sheet as at the end of the second operating quarter; and (ii) within 120 days after the end of any Unit operating year, an annual profit and loss statement and balance sheet as at the end of the fourth operating quarter, and a separate statement of Gross Room Revenues for the year then ended. Such annual financial statements shall be audited if an independent audit is required by Licensee's lenders or otherwise performed; otherwise, they shall be accompanied by the written certification of Licensee's chief executive officer and chief financial officer, if any, that all Unit transactions have been accurately recorded and are properly reflected in the books and records of the Unit.

(g) (<u>Food, Beverage and Other Services</u>) Licensee shall operate the approved Food and Beverage and other services as shown on Schedule B for the Term, unless it first obtains DIA's consent to add to, modify or discontinue such services. Licensee shall obtain DIA's written consent before commencing Food and Beverage services not specified on Schedule B, or entering into any subcontract or lease with third parties for Food and Beverage and other services at the Unit, provided that subcontracted or leased services shall be subject to Quality Standards and insurance requirements as set forth in the System Standards Manuals. "Food and Beverage" service shall include any restaurant, catering, bar/lounge,

NINN192

13

04592-13701-1015

entertainment, room service, retail food or beverage operation, continental breakfast, food or beverage concessions and similar services offered at the Unit.

(h) (Ownership Changes)  In addition to any applicable requirements of Section 17, Licensee will notify DIA in writing on such form(s) as DIA specifies in its System Standards Manuals and at least 5 days in advance of the occurrence, of any change through a single or series of related transactions of (i) 25% or more of the beneficial ownership of Licensee, or (ii) any percentage of the ownership of the Unit, if not owned by Licensee.  If Licensee is a partnership or joint venture, it will notify DIA as soon as practicable of the death or unplanned retirement of any general partner and/or any cumulative change of 25% or more in the right to receive distribution of Licensee's profits and losses.  Licensee shall, from time to time, but only if DIA so requests, provide DIA with lists of equity owners of Licensee and/or the Unit, and their respective interests.

(i) (Courtesy Lodging)  Licensee shall provide Unit lodging at the Days Inn System "Employee Rate" established in the System Standards Manuals from time to time, to DIA's and DIA's employees and representatives traveling on business, but shall not be obligated to provide more than three standard guest rooms for such purpose at the same time.

(j) (Minor Renovations)  Beginning on the third anniversary of the Commencement Date, and in addition to Licensee's obligations under Sections 9, 10 and 11, DIA may issue to Licensee a written "Minor Renovation Notice" given at least 60 days in advance of any required commencement date and not sooner than the third anniversary of the date of any prior written Minor Renovation Notice, that Licensee must then comply with (by the date specified in the notice) reasonable Unit upgrading and renovation requirements (a "Minor Renovation"), having an aggregate cost for labor, F/F/E and materials estimated by DIA to be not more than the "Minor Renovation Ceiling Amount".  The Minor Renovation Ceiling Amount shall be the product of $1,000.00 multiplied by the number of licensed Unit guest rooms, and shall be adjusted each March 1 beginning on March 1, 1989 by multiplying the $1,000.00 factor by the "Adjustment Factor," which is a fraction, the numerator of which is the "Consumer Price Index – Seasonally Adjusted U.S. City Average For All Items For All Urban Consumers (1982-1984=100)", published monthly by the Bureau of Labor Statistics, United States Department of Labor ("CPI-U"), for the month of January of the year of computation, and the denominator of which is the CPI-U for January, 1988.  The Minor Renovation Ceiling Amount factor is $1,163.35 on the date hereof. In no event shall any annual increase in the Minor Renovation Ceiling Amount exceed 6% of that Amount for the preceding year.  If CPI-U is discontinued, comparable statistics on the purchasing power of the consumer dollar published by the United States Department of Labor, or a responsible financial periodical or recognized authority selected by DIA shall be substituted.  DIA's computation of the Minor Renovation

NINN192

14

04592-13701-1015

Ceiling Amount shall be binding and conclusive in the absence of manifest error.

(k) (<u>Major Renovations</u>)  In addition to any renovations required by DIA to correct any Unit failure to meet the Quality Standards or the Design Standards, DIA may, not more than twice during the Term and only between the seventh and the fifteenth anniversaries of the Commencement Date, issue to Licensee a written "Major Renovation Notice" given at least 180 days in advance of the required commencement date, of major Unit upgrading and renovation requirements (a "Major Renovation") (which may include structural changes, additions to and modifications of facilities) having an aggregate cost for design, labor, F/F/E and materials estimated by DIA to be not more than the "Major Renovation Ceiling Amount" and necessary to meet DIA's then System Standards (collectively, the "Renovation Obligation").  The "Major Renovation Ceiling Amount" shall be the product of $10,000.00 multiplied by the number of licensed Unit guest rooms, and shall be adjusted each March 1 beginning on March 1, 1989 by multiplying the $10,000.00 factor by the Adjustment Factor.  The Major Renovation Ceiling Amount factor is $11,633.53 as of the date hereof.  In no event shall any annual increase in the Major Renovation Ceiling Amount exceed 6% of that Amount for the preceding year.  Licensee shall, unless it opts to exercise its Section 19 termination rights and pays the amounts required thereunder, comply with the Renovation Obligation by the "Completion Date" specified in DIA's notice.  Licensee will not be required to commence the second Major Renovation prior to the fifth anniversary of the date the first Renovation Obligation is completed.  Licensee may not operate the Unit under the System after the Completion Date (or such later date as the parties in writing agree) unless prior to such date Licensee receives DIA's written certificate that Licensee has satisfied the Renovation Obligation.

(l) (<u>Unit Modifications</u>)  Licensee will not modify, diminish or expand the Unit (or change its interior design, layout, F/F/E, or facilities) without the prior written consent of DIA.  Licensee shall pay with any request to expand the Unit, DIA's then current "Rooms Addition Fee" for each guest room to be added (which shall be no more than the Initial Fee per guest room then in effect).  Licensee shall obtain DIA's written approval of the plans and specifications for such additions prior to commencing the proposed work.  No rooms or facilities addition or modification of existing facilities, even though previously approved in concept, shall be opened to the public unless and until a DIA representative inspects the premises and certifies in writing that the addition or modification meets System Standards.

(m) (<u>Audits</u>)  Licensee will permit, during the Term and for 3 years thereafter, without prior notice, DIA and/or any independent accountants selected by DIA to audit, in person or by electronic access, any Unit financial records.  If such audit discloses a deficiency in any of the Continuing Fees due DIA, Licensee shall pay the deficiency and accrued interest within 10 days after receipt of the audit report.  If the

NINN192

deficiency is greater than 3% of the amount of Continuing Fees paid for the period as to which the deficiency exists, then Licensee shall pay the audit's reasonable costs.  If the audit discloses an overpayment of Continuing Fees, DIA will refund it to Licensee within 10 days after delivery of the audit report to DIA.  After three or more such audits during the Term each result in a determination that a deficiency exists for which Licensee is obligated under this paragraph (m) to pay the audit's reasonable costs, then DIA shall have the option, in its sole discretion, to require, by written notice given to Licensee prior to the start of any Unit operating year, that annual financial statements be certified by an independent accounting firm for that year and any subsequent years specified by DIA.

(n) (Indemnifications)  Licensee will indemnify, hold harmless, to the extent permitted by applicable law, and defend DIA, its parent, corporate affiliates and their respective employees, officers, directors, agents, representatives, successors and assigns (collectively, "Indemnitees") from and against any loss, cost, damage, liability, expense (including actual accountants' and attorneys' fees) incurred by any Indemnitee in any way directly or indirectly relating to or arising out of any claim, case or controversy about the acquisition, equipping, renovation, design, planning, demolition, financing, construction, operation, occupancy, maintenance, repair, or use of the Unit and/or Licensee's breach of Section 22 warranties, including without limitation, amounts paid to resolve disputes with Unit guests, and in cases alleging any Indemnitee's negligence in the supervision and inspection of the Unit, the training of Unit employees, and the specification of System Standards, but excluding any case in which the Indemnitee is held to have engaged in gross negligence or willful misconduct.  This indemnification shall survive termination of the License and this Agreement.

(o) (Insurance)  Licensee will maintain at its sole expense from the date of this Agreement, for the Term and so long as the Unit is identified as a System unit, and for the period of Unit construction before the Commencement Date, such duly paid insurance as may be required by the Unit's mortgagee and/or Licensee's other lenders, and, to the extent greater: (i) on and after the Commencement Date, "all risk" property coverage for the Unit with limits no less than 80% of replacement cost, with an endorsement if the Unit is in a flood plain, for floods; plus (ii) comprehensive broad form public and premises general liability insurance for the benefit of both Licensee and the Indemnitees, with endorsements covering at least contractual liability, innkeeper's liability, safe deposit liability (if applicable), liquor liability (if alcoholic beverages are served), personal injury liability (with employee exclusion deleted); (iii) workers' compensation and employer's liability; (iv) automobile liability coverage on owned, non-owned and hired vehicles used for Unit business; and (v) umbrella liability coverage.  All coverages shall be on an occurrence basis and in at least such minimum amounts together with such other coverages, as DIA may from time to time reasonably direct in System Standards Manuals, from an insurer(s)

NINN192

16

04592-13701-1815

acceptable to DIA, naming DIA and DIA, and any affiliate of DIA as may then own the License Agreement as additional insureds on all coverages except the "all risk" property coverage, and without right of subrogation against Indemnitees. Each such policy shall provide that it may not be cancelled, terminated, or materially changed without 30 days prior written notice to DIA. Licensee shall promptly deliver to DIA evidence of the inception and each renewal or replacement of such insurance coverage (failure of DIA to request evidence of the coverages it requires Licensee to maintain shall in no way constitute a waiver of the requirement). Licensee acknowledges that it has been advised of DIA's current minimum insurance requirements.

17.   Licensee: Assignments, Transfers and Subcontracts.

(a) (Consent Required) This Agreement is personal to Licensee. DIA is relying upon the exercise of skill, judgment and discretion by Licensee and its principals. Accordingly, and only subject to the first lien construction period and/or permanent Unit financing and refinancing thereof to which DIA's consent is not required, Licensee will not lease the Location or the Unit, and will not engage in or suffer the change, assignment, transfer, conveyance, or pledge, except with DIA's prior written consent (which may be withheld or conditioned in its sole discretion) directly, indirectly, or pursuant to several related transactions, or by operation of law (other than to a "Permitted Transferee") of: (i) any rights under this Agreement; (ii) on a cumulative basis, 50% or more of the equity interests in Licensee from the persons and amounts shown on Schedule A; (iii) any lesser percentage of Licensee's equity that constitutes effective control of Licensee; (iv) rights, duties or interests of any general partner of Licensee, including the admission of any substituted or additional general partner; or (v) any interest in the legal or equitable title to the Unit, or if leased by Licensee, the lessee's leasehold interest to the Unit. The term "equity interests" shall include all options, warrants and instruments convertible into conventional equity securities. If Licensee is a corporation, Licensee shall not, except with DIA's prior written consent (which may be withheld or conditioned in its sole discretion) merge, consolidate or issue additional stock in Licensee in a transaction which would have the effect of diluting the prior Licensee owners' combined interests in the surviving entity to less than 51%. If at least the majority of the equity securities of Licensee are registered under the federal Securities Act of 1933, as amended, or are a class of securities registered under the Securities Exchange Act of 1934, as amended, or are listed for trading on a national securities exchange or the automated quotation system of the National Association of Securities Dealers, Inc. (or any successor system), then such registered equity securities shall be freely transferable without the application of this Section 17 except in a single transaction or a series of related transactions involving the transfer of more than 50% of the outstanding equity securities of Licensee (other than a repurchase thereof by Licensee). DIA may, to

NINN192

17

04592-137701-1015

the extent permitted by applicable law, condition its consent upon the receipt of general releases from the assignor and each of its owners, the payment of the then transfer Application Fee and Initial Fee, execution of the then current System license agreement or an assignment and assumption agreement provided by DIA, upgrading of the Unit to meet then System Standards and payment of all amounts then owed DIA and their affiliates by Licensee under this Agreement or otherwise. A "Permitted Transferee" shall be any natural person(s) receiving the interest transferred without consideration by will, trust or intestate succession (but not by gift or by divorce settlement or decree), provided that such Permitted Transferee(s) agrees, in writing, to be bound by (at DIA's option) this Agreement or the License Agreement form then used for new licensees, and pays DIA its then effective "Processing Fee" for handling the transfer. All transferees (including Permitted Transferees) shall complete a training program, as DIA requires, at the Licensee's or transferee's expense (including reasonable tuition). Any attempted transfer, assignment or pledge which is not in accordance with this paragraph shall be void and shall give DIA the right to terminate the License and exercise other rights and remedies, including those under Sections 19 and 20, and Licensee shall nevertheless continue to be liable for Continuing Fees. DIA will use all reasonable efforts to process any transfer consent request within 30 days after DIA's receipt of all pertinent information.

(b) _(First Refusal Rights)_   Licensee shall advise DIA in writing (attaching conformed copies of all applicable agreements as executed) at least 30 days in advance of the closing date specified in any executed contract for the sale of the Location or the Unit, whether by conveyance of the Unit or by means of a transfer described in clauses (ii) or (iii) of paragraph (a) of this Section 17, DIA (or any affiliate) shall have the right and option, exercisable by sending written notice of exercise to Licensee on or before 5:00 p.m. New York time on the fifteenth business day after receipt of such notice, to purchase the Unit on the same terms and conditions as in the executed contract of sale. DIA may elect instead to pay the purchase price (including the fair market value of any non-cash purchase price terms) in cash at closing, provided, that DIA shall not be responsible for payment of any third party finders or brokerage fees, or for any non-cash or non-purchase price terms of the offer. If either a like kind exchange within the meaning of Section 1031, or a reorganization within the meaning of Section 368(a)(1)(A) or (B), both Sections of the Internal Revenue Code of 1986, as amended, is contemplated with respect to all or part of the purchase price, DIA may elect to pay in cash an amount equal to the fair market value of the offeror's property or securities to be exchanged or issued (as determined by an appraiser selected solely by DIA) offered by the third party. Any change in such terms or such purchaser, or any failure to complete such sale within 6 months after the date Licensee gives such notice to DIA, shall be treated as a new offer, entitling DIA to new first refusal rights. DIA's right of first refusal as to transfers described in paragraph (a), clauses (ii) and (iii) of this Section 17 shall arise:

NINN192

18

(i)  if, prior to one year after the Commencement Date, the business of Licensee consists mainly of the Unit; and (ii)  thereafter only if 75% or more of Licensee's gross revenues for the 12 months preceding the month in which the offer is received arise from the Unit and on-Location Food and Beverage service.  Licensee shall, if DIA so requests, execute such documents as DIA deems necessary or desirable, or DIA may file its affidavit, including all or parts of this Agreement, to record DIA's first refusal rights against the Location or its equity interests.

18.  <u>DIA Assignments and Subcontracts.</u>  DIA may assign or subcontract all or any part of its rights and duties under this Agreement, including by operation of law, without notice and without Licensee's consent.

19.  <u>Termination.</u>

(a)  (<u>Licensee Termination</u>)  If DIA gives Licensee a Major Renovation Notice, Licensee may (in lieu of complying with the Renovation Obligation) terminate the License by giving DIA at least 90 days prior written notice of the termination date and tendering with such notice a Termination Fee (to compensate DIA for lost revenues in an amount difficult to ascertain, and not as a penalty) in an amount equal to 100% of Licensee's aggregate Monthly Royalties which accrued with respect to the Unit during the 18 full months immediately preceding the giving of such notice by Licensee, but not less than the product of $1,000.00 multiplied by the number of licensed Unit guest rooms, plus any applicable Taxes.  The $1,000.00 factor shall be adjusted annually on each March 1 beginning March 1, 1989 by multiplying such amount by the Adjustment Factor.  The Termination Fee is at least $1,163.35 per guest room on the date hereof.

(b)  (<u>DIA Termination with Notice</u>)  DIA may terminate the License, or if the License is not then in effect, this Agreement, at any time effective upon the date specified in the termination notice (or the earliest date permitted by applicable law) if:  (i) Licensee fails to submit monthly reports then due under Section 16, paragraph (e) within 10 days after receipt of DIA's written demand for submission thereof; (ii) Licensee fails to pay any amount then due to DIA under this Agreement or otherwise within 10 days after receipt of DIA's written payment demand; (iii) Licensee fails fully to remedy any other breach of its obligations or warranties under this Agreement within 30 days (5 days for breach of Section 10, paragraph (f)) after receipt of written notice from DIA specifying one or more breaches of this Agreement, or such longer time as DIA may in writing allow; (iv) Licensee loses possession or the right to possession of all or a significant part of the Unit; (v) Licensee defaults in the performance of the terms and conditions of any other agreement with DIA or their affiliates, or any mortgage, deed of trust or lease covering the Unit, and fails to cure such default within t h e time permitted by the applicable instrument; (vi) Licensee knowingly maintains false books or records, or knowingly submits any false report to DIA; (vii) Licensee fails to pay its debts generally as they fall

NINN192

19

04592-137701-1015

due;(viii) Licensee shall receive two or more notices of default under this Agreement for the same or a similar cause or reason in any twelve month period, whether or not cured; (ix) Licensee makes or made any misstatement or omission of any material fact in connection with this Agreement or its DIA license application; or (x) Licensee fails to deliver within 60 days after the execution and delivery of this Agreement by DIA any other agreement with DIA or any other document, deed, instrument, certificate or writing relating to Licensee (including its owners, partners, officers, directors or finances), the Location, the Unit, or this Agreement requested by DIA in writing at or prior to execution of this Agreement by DIA, provided that DIA may exercise its right to terminate under this clause whether or not the Term commences but may not exercise this right after Licensee delivers all such required materials.  In any judicial proceeding in which the validity of termination is at issue, DIA will not be limited to the reasons set forth in any notice sent under this Section.

(c) (<u>DIA Termination Without Notice</u>)  DIA may, in its sole discretion, immediately terminate the License, or if the License is not then in effect, this Agreement, without notice (or at the earliest time permitted by applicable law) if: (i) Licensee violates or suffers a violation of Section 17; (ii) the Unit ceases to be operated under the System after the Commencement Date; or (iii) Licensee contests in any court proceeding the ownership of or DIA's right to license the System or any part of it, or the validity of any of the Marks.  The License, or if the License is not then in effect, this Agreement, shall automatically and immediately terminate without notice if any involuntary proceeding in bankruptcy is filed against the Licensee which is not dismissed within 60 days of filing, any voluntary proceeding in bankruptcy is filed by Licensee, Licensee is dissolved or liquidated, a receiver is appointed for Licensee or the Unit, or Licensee makes any assignment for the benefit of creditors.

(d) (<u>Casualty and Condemnation</u>)  If the Unit suffers destruction or significant damage by act of God or other event beyond Licensee's reasonable anticipation and control such that the Unit ceases to be operated in the normal course of business, Licensee shall promptly notify DIA in writing of the casualty event, giving information as to the availability of guest rooms and the Unit's ability to honor advance reservations. Licensee shall advise DIA in writing within 30 days after the casualty event whether it will restore, rebuild and refurbish the Unit to comply with the Approved Building Plans, which must be completed within 180 days after the casualty event, or it elects to terminate the License, effective as of the date of notice.  Licensee's failure to make such an election within the time permitted shall be deemed an election to terminate the License.  Any termination under this paragraph shall require no payment of Section 20 Liquidated Damages, provided Licensee pays all amounts owed to DIA accruing prior to the effective date of termination within 10 days after the termination notice is given or deemed to occur, and Licensee follows the post termination requirements

NINN192

20

04592-13701-1015

in Section 21.  Once undertaken, Licensee's failure to complete the restoration of the Unit on time or to pursue the same diligently shall permit DIA to terminate the License under Section 19, paragraph (b), clause (iii).  If the Unit is condemned, or such a substantial portion of the Unit shall be condemned such that continued operation in accordance with the System Standards, or with adequate parking facilities, is commercially impractical, or the Unit or the substantial portion is sold to the condemning authority in lieu of condemnation, then the License will be deemed terminated on the date the Unit or substantial portion is conveyed to or taken over by the condemning authority.  No Section 20 Liquidated Damages will be owed by Licensee in the event of such condemnation or sale if Licensee notifies DIA about the condemnation within 10 days after it receives formal notice from the condemning authority and then pays DIA all amounts due under this Agreement or otherwise within 30 days after the deemed termination date.

(e) (<u>Non-Waiver</u>)  Termination of the License by DIA or Licensee does not waive any Licensee obligation for accrued, unpaid Continuing Fees (including interest) or other liabilities and obligations arising out of any acts or omissions of Licensee prior to the effective date of License termination; and does not waive any obligations of the Licensee to perform all applicable provisions of this Agreement after such termination.  DIA reserves all rights at law or in equity, whether or not DIA first terminates the License, including without limitation the right to collect from Licensee by suit or otherwise all amounts due and to remove the Unit from the Reservation System.

20.    <u>Liquidated Damages.</u>  If the License terminates by action of the Licensee or under Section 19, paragraphs (b) or (c), Licensee shall pay DIA within 30 days following the date of such event, as "Liquidated Damages", an amount equal to the sum of the Monthly Royalties which accrued with respect to the Unit during the immediately preceding 24 full calendar months (or such shorter period as equals the unexpired Term at the date of termination, calculated in days, without regard to any express right to terminate the License prior to the expiration of the Term), but in no event less than the product of $2,000.00 multiplied by the number of licensed Unit guest rooms, plus any applicable Taxes assessed on such payment.  The $2,000.00 factor shall be adjusted annually on each March 1, beginning March 1, 1989, by multiplying such amount by the Adjustment Factor.  The Liquidated Damages Amount is at least $2,326.70 per guest room on the date hereof.  If the License Agreement terminates prior to the Commencement Date, Licensee shall pay DIA within 30 days following the date of termination Liquidated Damages in an amount equal to the product of $500.00 multiplied by the number of Unit guest rooms, plus any applicable Taxes.  The $500.00 factor shall be adjusted each March 1, beginning March 1, 1990, by multiplying such amount by the Adjustment Factor.  This factor is $581.68 as of the date hereof.  Payment of Liquidated Damages shall be in addition to all other DIA rights to obtain equitable relief, to collect amounts owed it accruing prior to termination of the License, and to enforce survival of the

NINN192

04592-13701-1015

indemnification by Licensee under Section 16, paragraph (n). The parties acknowledge that the injury caused DIA by Licensee's breach is difficult or impossible of accurate estimation, that they intend to provide for compensation for damages and not as a penalty and that the stipulated method of computation constitutes a reasonable pre-estimate of DIA's probable loss resulting from such Licensee breach.

21.   **Licensee's Duties At and After Termination.** Upon termination of the License or this Agreement for any reason whatsoever:

(a) <u>(System Usage Ceases)</u>  Licensee shall immediately desist from representing and holding out to the public that it is a System member, and shall cease using the System, including all Marks and Mark-bearing menus, supplies, signage, stationery, F/F/E, and other personalty, and comply with all post-termination procedures specified in the System Standards Manuals. Licensee shall promptly take appropriate steps to cancel any assumed or fictitious name filing which includes any Mark. Any post-termination Mark usage by Licensee shall be deemed a willful infringement of DIA's Lanham Act and other rights.

(b) <u>(Other DIA Remedies)</u>  DIA (or its representatives) may immediately remove the Unit from the Reservation System and divert reservations as set forth in Section 12. DIA may also, to the extent permitted by applicable law, and without prior notice of any kind, enter the Location, and any other parcels, remove equipment of DIA, and paint over or remove and purchase for $10.00, all or part of any interior or exterior Mark-bearing signage not removed or obliterated by Licensee on or before the effective date of License termination. DIA's cost of removing signage will be paid or reimbursed by Licensee, and will be added to the amounts of accrued, unpaid Continuing Fees to be collected from Licensee, net of the $10.00 purchase price of such signage. DIA shall exercise reasonable care to avoid undue damage in removing and/or painting over signage, but shall have no obligation or liability to restore or repair damage to the Unit premises or equipment resulting therefrom. DIA may give notice to any lessor of Mark-bearing signage or other items to remove such signage and items and terminate the lease obligation of Licensee.

(c) <u>(Mark-Bearing Items)</u>  DIA shall have the right (subject to the requirements of applicable laws), but not the obligation, to purchase some or all of the Unit's Mark-bearing F/F/E and supplies at the lower of their cost or net book value, with the right to set off the aggregate purchase price thereof against any sums then owed DIA by Licensee.

(d) <u>(Advance Reservations)</u> Licensee will honor any advance reservations, including group bookings, made for the Unit prior to termination at the rates and on the terms established when the reservations are made.

22.   **Representations and Warranties.** The parties disclaim any representation,

NINN192

22

covenant, or warranty, express or implied (including validity or registrability of any Mark, the tax consequences or potential profitability of the transactions contemplated by this Agreement, or the value or quality of any services or products purchased by Licensee in furtherance of this Agreement), except as expressly set forth in this Agreement, and except that Licensee expressly represents and warrants to DIA as follows:

(a) (<u>Quiet Enjoyment</u>) It is the fee simple title holder or ground lessee of the Location and will continue to be entitled to possession of the Unit during the entire Term without restrictions that would interfere with its performance under this Agreement.

(b) (<u>Expertise</u>) It has (or will employ persons or management firms approved under Section 16, paragraph (b) which have) the necessary management expertise and experience to design, construct, acquire, develop, equip, operate, market, maintain, and manage the Unit.

(c) (<u>Assumes Risks</u>) It has received, at least 10 business days prior to execution of this Agreement, read and understood DIA's current FRANCHISE OFFERING CIRCULAR FOR PROSPECTIVE FRANCHISEES (which circular includes a copy of the form of this Agreement), including the disclaimers regarding earnings claims on the inside front cover and in Item XIX therein, and had ample opportunity to consult with its advisors. It acknowledges that the reasons for termination under Sections 4 and 19 constitute good cause, and that the notice provisions relating thereto constitute reasonable notice. It has independently investigated the risks of the transactions contemplated hereby, and either (i) has substantial prior experience in the construction and operation of hotels and/or motels, or (ii) has obtained, relies with confidence upon, and acknowledges that DIA does not warrant the validity of (even if obtained at DIA's request), advice of third parties with such prior or similar experience, or information from existing and former Days Inn System licensees, and/or a positive market feasibility study for the Location from an independent accounting or consulting firm.

(d) (<u>Compliance with Laws</u>) The Unit will be built and operated in compliance with all local, state and federal laws, ordinances, rules and regulations. Licensee will certify from time to time, as DIA may reasonably require, that it is in compliance with all applicable laws and regulations, and has obtained and maintained all necessary licenses and permits.

(e) (<u>Taxes</u>) It will file all required tax returns, and pay when due all required taxes.

(f) (<u>No Misrepresentation</u>) All written information provided to DIA about the Unit, or the Licensee, the principal owners of Licensee, any guarantor, or the finances of any such persons or entities, was or will be at the time delivered, true, accurate and complete, and such

NINN192

04592-13701-1015

information contained no misrepresentation of a material fact, and did not omit to state any material fact necessary to make the information disclosed not misleading under the circumstances in which it was disclosed.

(g) (<u>Authority</u>) Licensee has full power and authority and has been duly authorized, to enter into and perform its obligations under this Agreement, all necessary approvals of any Board of Directors, shareholders, partners, co-tenants and lenders having been obtained. The execution, delivery and performance of this Agreement by Licensee will not violate, create a default under or breach of any charter, bylaws, agreement, indebtedness, certificate, order, decree or security instrument to which Licensee or any of its principals is a party or is subject, or to which the Unit is subject. Licensee or the Unit is not the subject of any current or pending dissolution, receivership, bankruptcy, reorganization, insolvency, or similar proceeding on the date this Agreement is executed by DIA and was not within the three years preceding such date, except as disclosed in the License Application. The persons signing this Agreement on behalf of Licensee personally represent and warrant to DIA that they are authorized to execute this Agreement and any other agreement with DIA for and on behalf of Licensee and have full authority to so bind Licensee.

23.    <u>Miscellaneous.</u>

(a) (<u>Notice</u>) Any notice required or desirable hereunder shall be sent in writing, by First Class United States Mail (effective upon posting) or other delivery means (effective upon receipt), including without limitation electronically through the Reservation System computer terminal equipment, to the following addresses (or as the parties may from time to time in writing designate):

To Licensee:

Piyush Patel, Individually
1515 West Lincoln Way
Cheyenne, Wyoming  82001
Attn: Piyush Patel

To DIA:

Days Inns of America, Inc.
339 Jefferson Road
Parsippany, New Jersey 07054
Attn:  Franchise Administration

Provided, however that any Section 17 notice of transfer, or any notice of default or License termination, shall be sent by certified mail or other means of receipted courier delivery, or by facsimile transmission with confirmation by certified mail, and shall be effective upon

NINN192

24

04592-13701-1015

delivery, whether or not accepted by Licensee.

(b) (<u>Relationship</u>) DIA and Licensee are not (by virtue of this Agreement alone) joint venturers, partners, agents of or for each other, and neither shall have the power to obligate the other. The license relationship is not and will not be a fiduciary relationship.

(c) (<u>Remedies and Waiver</u>) Failure, delay or forbearance of DIA to insist on strict performance of any of the terms and provisions of this Agreement, or to exercise any right or remedy, shall not be construed as a waiver. Express waiver in one or more instances shall not waive subsequent strict performance. Remedies specified in this Agreement are cumulative and not exclusive of any remedies available at law or in equity. Licensee acknowledges that DIA will suffer irreparable harm to the good will of the System and Marks, and will be entitled to injunctive relief to enjoin Licensee's violation of this Agreement. Licensee agrees to pay all costs and expenses, including attorneys' fees, incurred by DIA in enforcing any provision of this Agreement.

(d) (<u>Construction</u>) This Agreement: (i) including all addenda, schedules and exhibits, is the parties' entire agreement, superseding all prior oral and written agreements and understandings; (ii) shall be severable and the failure of any distinct part will not void the remainder; (iii) can be amended only in a writing signed by authorized representatives of both parties, except that DIA may circulate a revised Schedule C from time to time which shall not require signature by Licensee to be effective; (iv) shall be deemed executed in and shall be governed by the laws of the State of New York; (v) shall, except as otherwise herein provided, bind and inure to the benefit of the parties signatory, their successors and assigns; (vi) shall not be construed to create (other than in DIA) any third party beneficiary rights; and (vii) may be executed in any number of counterparts. Section headings are for convenience only and shall not affect interpretation. All references to specific statutes shall include all amendments thereof and successors thereto. All references to the neuter gender shall also refer to the masculine and feminine genders, as the context requires or permits.

(e) (<u>Effects of Laws and Regulations</u>) If this Agreement is or becomes subject to any law or regulation: (i) which limits DIA's right to terminate the License, any inconsistent provisions of this Agreement shall be deemed stricken and DIA shall be deemed to have every termination right permitted under such law or regulation at the time DIA acts to terminate the License; (ii) which limits DIA's right to fail or refuse to renew the license at expiration of its Term, this Agreement shall be deemed amended to grant Licensee an option to obtain a new license agreement for a five year term in the form and for the fees then offered by DIA for conversions of non-System facilities, provided that Licensee satisfies DIA's requirements (which may include major renovations, upgrading and the like) for meeting System Standards for conversions; (iii) which prohibits liquidated damages provisions, such

NINN192

04592-13701-1015

provisions shall be deemed stricken and the parties shall have the right to seek appropriate damages; (iv) which otherwise conflicts with any other provision of this Agreement, such provision shall be deemed amended to permit DIA to exercise rights of that type to the maximum extent permitted by such law or regulation, or if not permitted, the provision shall be deemed stricken.

(f) (<u>Consent to Jurisdiction</u>)  Licensee consents to and waives any and all objections to the non-exclusive personal jurisdiction of the courts of the State of New York and the United States District Court for the Southern District of New York and further waives objection to venue in any such court, in and for all cases and controversies at law and in equity relating to or arising under this Agreement, related and ancillary agreements with DIA and their affiliates, and the relationship between Licensee and DIA.

24.    <u>Special Stipulations.</u>

(a) (<u>Additional Licensee Termination Right</u>) If Licensee is not then in default under this Agreement, Licensee shall have the right to terminate the License without cause effective only on the fifth anniversary of the Commencement Date of the Unit provided it has first given DIA at least sixty (60) days prior written notice of termination.  Licensee shall be liable to pay no Section 20 liquidated damages if License is terminated properly in accordance with the preceding sentence and Licensee performs the post termination obligations specified in Section 21 within 10 days after the date of termination.  Licensee's rights under this stipulation shall automatically terminate if (i) DIA sends to Licensee a notice of termination under Sections 4 or 19, or the License automatically terminates, or DIA sends Licensee a notice of default and Licensee fails to cure the default within the time permitted, if any, in the notice of default or, (ii)  after the Unit achieves any required 400 quality assurance inspection score the Unit receives a quality assurance inspection score of less than 400 (or its equivalent) and the Unit fails to achieve a quality assurance inspection score of at least 400 in a reinspection to be performed not less than 30 days after the initial inspection.

(b) (<u>Additional DIA Termination Right</u>)  DIA shall have the right to terminate the License without cause effective only on the fifth anniversary of the Commencement Date provided it has first given Licensee at least (60) days prior written notice of termination.  Licensee shall be liable to pay no Section 20 liquidated damages if the License is terminated in accordance with the preceding sentence, and Licensee performs the post termination obligations specified in Section 21 with 10 days after the date of termination.

(c) (<u>Protection of Territory</u>) For a period of time beginning on the date

NINN192

04592-13701-1015

of this Agreement and ending on the fourth (4th) anniversary of the Commencement Date, without first obtaining Licensee's consent, DIA will not issue any Days Inn System licenses to any person other than Licensee for the operation of a Days Inn System Unit, within the "Protected Territory", which shall be an area delineated on the attached Exhibit "C". If Licensee consents to any additional Days Inn System unit within the Protected Territory, such consent will be deemed to include a unit added in the future as a replacement for the Unit for which the consent is originally granted. This paragraph shall become null and void if (i) the License or this Agreement terminates under Section 4, or Section 19, or Section 24 (ii) DIA sends to Licensee a notice of default, and Licensee fails to cure the default within the time permitted, if any, in the notice, (iii) after the Unit achieves the required 400 quality assurance inspection score, if the Unit receives a quality assurance inspection score of less than 400 (or its then equivalent) and the Unit fails to achieve a quality assurance inspection score of at least 400-B in a reinspection to be performed at least 30 days after the initial inspection.

(d) (Right of First Refusal)  For a period of time beginning on the fourth anniversary of this Agreement through the balance of the Term, Licensee shall have a right of first refusal with respect to applications for Days Inn System licenses and opportunities for development of prospective hotel locations within the area delineated on the attached Exhibit "C" (the "Right of First Refusal Area"). If DIA receives an application for a proposed hotel site within the Right of First Refusal Area, or DIA or a DIA subsidiary determines that it desires to pursue a hotel development opportunity within the Right of First Refusal Area, DIA shall give Licensee written notice of the proposed hotel site. Licensee shall have a period of ten (10) days from the date it receives such notice to submit a completed license application and the then current application fee for a proposed alternative hotel site within the Right of First Refusal Area. DIA will accept Licensee's application after an inspection of the site by DIA determines that the site is a reasonably acceptable alternative to the proposed hotel site of the other applicant or DIA and the application is otherwise in order. If Licensee fails to make timely submission of a complete application and fee, or the proposed alternative site is not reasonably acceptable to DIA, or Licensee fails to execute DIA's then current form of license agreement and related agreements and pay the then current initial fee within forty-five (45) days after submission of such agreements for execution, or Licensee shall be in default under this Agreement at the time notice must be given by DIA of an application or affiliate development opportunity in the Right of First Refusal Area, then DIA shall be free to accept the other applicant or to advise its affiliate to proceed with development, without any further obligations of any kind to Licensee. This paragraph shall become null and void if (i) the License or this Agreement terminates under Section 4, or Section 19, or Section 24 (ii) DIA sends to Licensee a notice of default, and Licensee fails to cure the default within the time permitted, if any, in the notice, (iii)

NINN192

27

04592-13701-1015

after the Unit achieves the required 400 quality assurance inspection score, if the Unit receives a quality assurance inspection score of less than 400 (or its then equivalent) and the Unit fails to achieve a quality assurance inspection score of at least 400-B in a reinspection to be performed at least 30 days after the initial inspection.

(e)  (Transfer Rights) Notwithstanding Sections 16 and 17, if Licensee is not then in default under this Agreement, the License may be transferred upon Licensee's written request, the transferee's submission of a completed application on DIA's then current form, the transferee's qualification under DIA's then current standards for new licensees, and payment of a $10,000.00 transfer fees, but only if the written transfer request is received by DIA within sixty months after the date of this Agreement.  DIA may require the execution of its then current standard forms of license agreement, a new or supplemental guarantee agreement and related agreements by the transferee and its principals, payment of all Continuing Fees and other amounts due under this Agreement, payment of other amounts then owed DIA and their affiliates by Licensee, the transferee, or their respective affiliates and principals, reasonable renovation and upgrading of the Unit to System Standards applicable to entering conversion Units at that time, and the execution of general releases by Licensee and each of its principals as conditions precedent to the transfer.  Under no circumstances shall any such transfer have the effect of releasing Licensee from its obligations hereunder or releasing the liability of any guarantor of Licensee's obligations, arising or accruing prior to, or in respect of events occuring prior to, the transfer.

(f)  (Liquidated Damages) Notwithstanding the foregoing, in no event shall the amount payable pursuant to Section 20 be greater than $1,500.00 per room.

(g)  (Consent to Build Additional Rooms)  Licensee may construct, in accordance with the applicable System Standards and the approval procedures of DIA set forth in Section 4, additional guest rooms (the "Addition") to the then existing Unit without payment of a Rooms Addition Fee if Licensee gives written notice to DIA that it will construct the Addition.  Licensee will be in default under this Agreement if the Addition is not ready to be open for business under the Days Inn System, after obtaining all required DIA approvals, within twelve months after Licensee begins construction of the Addition.

(h)  (Additional Termination Rights)  For the first twenty-four months of this Term, in the event the annual Gross Room Revenue for the Unit fails to exceed the annual Gross Room Revenue for the Unit for the previous twelve months immediately prior to the commencement date of the unit, as stated in Exhibit "D" attached hereto, and If Licensee is not then in default under this Agreement, Licensee shall have the right to terminate the License without cause effective after the third anniversary

NINN192

28

04592-13701-1015

of the Commencement Date of the Unit provided it has first given DIA at least twelve (12) months prior written notice of termination. Licensee shall be liable to pay no Section 20 Liquidated Damages if License is terminated properly in accordance with the preceding sentence and Licensee performs the post termination obligations specified in Section 21 within 10 days after the date of termination. Licensee's rights under this stipulation shall automatically terminate if (i) DIA sends to Licensee a notice of termination under Sections 4 or 19, or the License automatically terminates, or DIA sends Licensee a notice of default and Licensee fails to cure the default within the time permitted, if any, in the notice of default or, (ii) after the Unit achieves any required 400 quality assurance inspection score the Unit receives a quality assurance inspection score of less than 400 (or its then equivalent) and the Unit fails to achieve a quality assurance inspection score of at least 400 in a reinspection to be performed not less than 30 days after the initial inspection.

(i)    (Inter-Brand Transfer) Hospitality Franchise Systems, Inc. ("Company") is the parent company of Days Inn of America, Inc., Howard Johnson Franchise Systems, Inc., and Ramada Franchise Systems, Inc. Our Company is willing to consider your future conversion from a Days Inn to a Howard Johnson or Ramada lodging facility, upon the following terms and conditions:

1.  At the time of your request, your license agreement with Days Inn of America, Inc. must be in full force and effect, and you must not be in default of your license agreement.

2.  At the time of your application, our Company must still own the franchising rights to the Days Inn, Howard Johnson, and Ramada systems in the United States.

3.  The right to apply for conversion to a Howard Johnson or Ramada lodging facility shall be upon the then prevailing terms and conditions, required for prospective Howard Johnson or Ramada licensees.

4.  The right to apply for a Howard Johnson or Ramada license shall in no way imply that you shall be granted a Howard Johnson or Ramada franchise, or the terms and conditions upon which the license will be granted.

5.  In the event that your application to convert to a Howard Johnson or Ramada is not approved, your Days Inn license agreement shall remain in full force and effect.

6.  Provided that our Company owns the franchising rights to the Days Inn, Howard Johnson, and Ramada Systems at the time that your application to convert to a Howard Johnson or Ramada is approved, you shall enter into a Howard Johnson or Ramada license agreement

04592-13701-1815

upon the terms and conditions required by Howard Johnson or Ramada Franchise Systems, Inc., pay all amounts due and owing to Howard Johnson or Ramada Franchise Systems, Inc. through the date of Termination. In the event you are approved to convert to the Howard Johnson or Ramada System but do not enter into a Howard Johnson or Ramada license agreement, your Days Inn license agreement shall remain unmodified and in full force and effect.

(j)  Days Inn agrees to offer to the licensing of any approved Unit that is solely controlled by any of the above principles, the terms and conditions of the License Agreement, provided license agreements are executed prior to December 31, 1994.

(k)  (Minimum Annual Royalty)  Notwithstanding anything contained in Section 8 (e) to the contrary, the Minimum Annual Royalty payable pursuant to this Agreement shall be $0.00.

(l)  (Licensee's Renewal Rights.) If Licensee is not then in default under this Agreement, Licensee may renew the License granted under this Agreement one time for an additional ten year term, to follow immediately without lapse upon the expiration of the initial Term, subject to Licensee's compliance with the following conditions for renewal: (i) Licensee shall give DIA not more than 90 days and not less than 60 days prior written notice of its intent to renew this Agreement; (ii) Licensee and its principals shall execute and deliver to DIA a license agreement, guarantee agreement and related agreements on DIA's then current standard forms for conversion franchises, after submission of such agreements to Licensee and the lapse of any waiting periods then required by law, but in any event not later than 15 days prior to the expiration of the Term; (iii) Licensee shall pay together with its submission of the license agreement and related agreements described in clause (ii) above, all amounts of Continuing Fees and other charges owed to DIA then due; and (iv) the Unit shall have received an average quality assurance inspection score of 400-B or its then equivalent for the inspections occuring during the 12 months preceding the date of the renewal notice.

DIA will provide the necessary disclosure of its then current forms of license agreement and related agreements in accordance with then applicable federal and state disclosure requirements in accordance with written request from Licensee.  When DIA receives the notice described in clause (i) above from Licensee, it shall produce the license agreement and related agreements within 20 days after receipt or notify Licensee that the Unit does not qualify for renewal of its License because the condition described in clause (iv) is not satisfied. DIA covenants with Licensee to cause the execution and delivery by its officers of the successor license agreement and related agreements if all of the above described conditions are satisfied by Licensee in a timely manner.  Upon the execution and delivery  by DIA of such successor forms of license agreement and related agreements, the payment of all Continuing Fees

NINN192

04592-13701-1015

accruing prior to the expiration of the Term, and the expiration of the Term, this Agreement and the related agreements of even date herewith between DIA and Licensee shall become null and void, except for the indemnification set forth in Section 16, paragraph (n), which shall continue until all applicable statutes of limitation have expired as to DIA and the named indemnitees.

(m)  (Extension Fee.)  Notwithstanding anything contained in Section 7 (c) to the contrary, the Extension Fee payable pursuant to this Agreement shall be $0.00

(n)  (Reservation System Fees.)  Notwithstanding anything contained in Section 8 (b) to the contrary, in no event shall the amount payable pursuant to Section 8 (b) be greater than 1.5% of Gross Room Revenues.

(o)  (Annual Conference Fee.)  Notwithstanding anything contained in Section 8 (f)  to the contrary, Licensee will be required to pay the Annual Conference Fee only for each individual representative regardless of Licensee attending the annual franchise conference functions.

(p)  (Training and Consulting Services.)  Notwithstanding anything contained in Section 14 to the contrary, Licensee's of Agreements 1-13 shall only be obligated to send in the aggregate three regional representatives of Licensees for training, required by DIA.

(q)  (Minor Renovations.)  Notwithstanding anything contained in Section 16 (j) to the contrary, provided that the Facility averages a Quality Assurance Score of at least 400 points in the previous 2 inspections, DIA may not issue a written "Minor Renovation Notice" to Licensee.

(r)  (Major Renovations.)  Notwithstanding anything contained in Section 16 (k) to the contrary, provided that the Facility receives a Quality Assurance Score of at least 400 points in the previous 2 inspections, DIA may not issue a written "Major Renovation Notice" to Licensee.

(s)  (First Refusal Rights.)  Notwithstanding anything contained in Section 17 (b) to the contrary, the First Refusal Rights are hereby deleted.

(t)  (Notice.)  Any notice required shall be sent to three general partners as provided by Licensee.  However, failure to provide notice to all three shall not be deemed a default of the License Agreement by DIA.

(u) (Initial Entry Charge.)  Notwithstanding anything contained in Section 7 (b) to the contrary, the Initial Entry Charge payable pursuant to this Agreement shall be $0.00

(v) (Satellite Communications System Charges.)  Notwithstanding anything contained in Section VI of Schedule "C" to the contrary, Satellite

NINN192

Communications System Charges are hereby waived.

THE PARTIES HAVE EXECUTED THIS AGREEMENT AS OF THE ABOVE DATE:

LICENSEE:

By: _____
    Piyush Patel, Individually

Witness: _____

DIA:

DAYS INNS OF AMERICA, INC.

By: _____
    Gregory D. Casserly
    Executive Vice President
    Franchising

Attest: _____
    (Assistant) Secretary

NINN192

32

**EXHIBIT B**

## ASSIGNMENT AND ASSUMPTION AGREEMENT

This "Agreement" is made and entered into as of _1/3/_____, 1997 by and among Piyush Patel, Individually ("Assignor"), Yogi of Norfolk, Inc., a Nebraska corporation ("Assignee"), and **DAYS INNS OF AMERICA, INC.,** a Delaware corporation (the "Company").

Recitals. Assignor is the Licensee under a License Agreement and a Reservation System Interface Software License Agreement, both dated October 26, 1992 (collectively, the "Agreements") with the Company. The Agreements are attached to this Agreement as Exhibit A and relate to the granting of a Days Inn System license for a lodging facility designated as Unit No. 4592, located at 1001 Omaha Avenue, Norfolk, Nebraska (the "Facility"). Assignor is conveying the Facility to Assignee. Assignor desires to assign the Agreements to Assignee, which desires to assume and accept the rights and obligations under the Agreements, effective as of the date of this Agreement.

IN CONSIDERATION of the premises, the mutual promises in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are acknowledged by the parties, it is agreed as follows:

1. Assignor assigns, transfers, bargains, sells, and delegates to Assignee all of its rights, title and interest in and to the Agreements, and its obligations existing and arising in the future, under the Agreements.

2. Assignee accepts and assumes the rights, benefits and obligations of the Licensee under the Agreements, effective as of the date of this Agreement, including all existing and future obligations to pay and perform under the Agreements. Assignor shall remain secondarily liable for payment and performance of the Agreements. The owners of Assignee have executed the Guaranty attached to this Agreement.

3. To induce the Company to consent to this Agreement and the assignment of the Agreements, Assignee adopts and makes to the Company the representations and warranties of Licensee set forth in the License Agreement as of the effective date of this Agreement. Assignee is the owner of fee simple title to the Facility as of the effective date of this Agreement. Assignee's owners are shown on Exhibit "B" attached to this Agreement.

4. Assignee will deliver, together with this Agreement, evidence of insurance meeting System Standards, as contemplated under the Agreements and the Days Inn System Standards Manuals.

5. This Agreement shall be deemed a supplement to and modification of the Agreements. All references to "the Agreement" contained therein shall mean and refer to the original form of License Agreement or Reservation Equipment Agreement as the case may be, as modified by any prior amendments and addenda and this Agreement. Except as expressly stated, no further supplements to or modifications of the Agreements are contemplated by the parties. There are no oral or other written arrangements between the Company and Assignor except as expressly stated in

the Agreements and any written amendment or addendum thereto included as part of Exhibit "A". The Agreements, as previously modified, are incorporated by this reference.

6. Assignor and Assignee acknowledge that the Company has not participated in the negotiation and documentation of the transfer transaction between the parties, and has not made any representation or warranty, nor furnished any information to either party. Assignee waives any and all claims against the Company and its officers, directors, shareholders, affiliated corporations, employees and agents arising out of the transfer of the Facility. Assignee expressly acknowledges that the Company was not a participant in such transaction and that the Company has no liability in connection therewith. Assignee acknowledges that it has made such investigations of Assignor and the Facility as it believes appropriate.

7. Any notice required under the Agreements to be sent to Assignee shall be directed to:

Piyush G. Patel
7207 Tumbleweed Dr
Cheyenne, WY 82009
Attn: _____

8. The Company consents to the assignment and assumption of the Agreements as provided in this Agreement. No waivers of performance or extensions of time to perform are granted or authorized. The Company will treat Assignee as the Licensee under the Agreements.


**{THE BALANCE OF THIS PAGE IS INTENTIONALLY BLANK}**

IN WITNESS WHEREOF, the undersigned have executed and delivered this Agreement effective as of the date first above written.

**THE COMPANY:**
**DAYS INNS OF AMERICA, INC.**

By: _(signature)_                              Attest~: _(signature)_
     Vice President

                                     **Jeffrey I. Burnett**
                                     **Assistant Secretary**

**ASSIGNOR:**
**PIYUSH PATEL**

_(signature)_                              Witness: _(signature)_
Piyush Patel

**ASSIGNEE:**
**YOGI OF NORFOLK, INC.**

By: _(signature)_                              Attest: _(signature)_
Title: _(signature)_                                   Secretary

# EXHIBIT C

## GUARANTEE AGREEMENT

As an inducement to Days Inns of America, Inc. ("DIA") to execute the preceding License Agreement, dated as of even date herewith, with Piyush Patel, Individually, as Licensee, the undersigned (if more than one, jointly and severally) hereby agree to be bound by all terms of the License Agreement and any amendments thereof, and supplements thereto, including all addenda, schedules and exhibits now or hereafter existing, and irrevocably, unconditionally and personally guarantee to DIA, its affiliates, successors and assigns, that all of Licensee's obligations thereunder (including without limitation payment of all Initial Fees, Continuing Fees, rooms addition fees, transfer fees, processing fees, attorneys' fees and costs of enforcement of DIA's remedies) and under any promissory note issued by Licensee to DIA or its order, will be punctually paid and performed. The undersigned waive, to the extent permitted by applicable law, notice of acceptance, notice of default, presentment and demand. Upon default by Licensee and receipt of written notice from DIA, the undersigned will immediately make each payment and perform or cause to be performed each obligation of Licensee under the Agreement. DIA may to the extent permitted by applicable law (without affecting any obligation of any of the undersigned) waive any Licensee default, extend any Licensee cure period, or settle, adjust, compromise or release any indebtedness of or claims against Licensee. The undersigned waive notice of amendment of the License Agreement, and demand for payment or performance by Licensee. The undersigned further waive the defenses of novation, increase in risk, release or compounding of any other guarantor, or any requirement that DIA first exhaust other remedies, resort to any collateral, or proceed diligently to collect any amounts due from Licensee, this Guarantee Agreement being a primary obligation of the undersigned and a guarantee of payment and performance, not of collection. Upon death of an individual guarantor, the estate of such guarantor will be bound by this Guarantee Agreement with respect to any defaults existing at the time of death. If there is more than one guarantor, the obligations of the other undersigned guarantors will continue in full force and effect without change. The guarantor(s) shall be obligated to pay DIA's costs, including reasonable attorney's fees, incurred to enforce its rights and remedies against Licensee under the License Agreement or under this Guarantee Agreement. This Guarantee Agreement shall be governed by and construed under the laws of the State of New York. Each guarantor consents to the non-exclusive personal jurisdiction of the courts of the State of New York and the United States District Court for the Southern District of New York and further waives objection to venue in any such court in and for all cases and controversies at law and in equity relating to and arising under this Guarantee Agreement.

Dated: 10/26 , 19 92

Signature Witness:

_____ F. Clate/ _____

Guarantor:

Piyush A Patel (SEAL)

Piyush Patel, Individually

# **EXHIBIT D**

Location: **NORFOLK, NE**
Site: **04592-13701**

## SATELLITE CONNECTIVITY SERVICES ADDENDUM

This Satellite Connectivity Services Addendum (the "Addendum") by and between Days Inns Worldwide, Inc. ("we," "our," "us") and Yogi of Norfolk, Inc. ("you," "your") is dated ___/2//7___, 2003 (the "Addendum Effective Date"). This Addendum is part of the License Agreement (the "Agreement") between you and us.

Notwithstanding anything to the contrary set forth in the Agreement, the following provisions shall supercede and apply:

1. <u>Services</u>. Our affiliate has entered into an agreement with Hughes Network Systems, Inc. ("HNS") under which we are authorized to provide our licensees with satellite-based Internet connectivity services. The specific satellite communications services ("Services") and related equipment necessary for the proper functioning of the Services ("Equipment") are listed in Schedule 1 of this Addendum. We will furnish to you the Services and Equipment (collectively, the "VSAT System") for the Facility. Once installed, you will access the Central Reservation System, the Central Data Warehouse, the Email Network and the Brand Information Source (as those terms are defined in the Software and Services Agreement) using only the VSAT System, except in emergencies, while this Addendum remains in effect.

2. <u>Site Inspection</u>. You will reasonably cooperate with us and HNS to determine how the Equipment will be installed. You will furnish us or HNS with any information requested in order to complete the installation. We or HNS, in our sole discretion, will determine the placement of the Equipment at the Facility, which is intended to ensure the optimal performance of the Services.

3. <u>Installation</u>. HNS will install the Equipment at the Facility during regular business hours, when possible. HNS may install, at its sole discretion, anti-icing equipment to protect the Equipment at the Facility at no additional cost to you. If anti-icing equipment is installed, you must provide, at your expense and prior to the installation date, a source of 110V GFCI 20-amp non-dedicated circuit AC power that is readily available at the antenna site. If your installation involves more than two access devices, or additional Equipment, cabling or costs beyond the standard installation package, we may charge you for the charges we incur with HNS to complete installation of the VSAT System, plus an administrative charge of not more than $50.00. You will allow installation personnel reasonable access to all areas of the Facility necessary to perform the installation. You will obtain in advance, if necessary, any required permits, approvals or consents from any governmental authority, your landlord or mortgagee to install the Equipment at the Facility, including access to the premises of a third-party, if necessary, to complete the installation. You will permit the installation of certain Equipment on the roof or attached to the exterior walls of the Facility. You will furnish to the installation personnel, free of charge, adequate electrical power, local telephone service, water and other utilities necessary to perform the installation. If (a) you postpone a scheduled installation with less than seven (7) days prior written notice to us, or (b) an installation is delayed or aborted

1

because you did not comply with this Section 3 (collectively, a "Cancellation"), you will pay us an Installation Cancellation Charge of $1,000.00 within five (5) days after our written notice to you. If a second Cancellation occurs, you will be in default under this Addendum. You must then cure this default within thirty (30) days after you receive written notice from us. Toll-free access to the Central Reservation System will be unavailable to you while you are in default under this Addendum.   We will provide and will reprogram your property management system or property terminal unit to dial a working telephone number for Central Reservation System access, which may cause you to incur toll charges.

4.   Operations; Authorizations. (a)   Once installed, you will not move the Equipment without our prior written consent.   You will maintain the Equipment according to the environmental conditions we specify.  Upon reasonable prior notice, you will give us or HNS reasonable access to inspect the Equipment.

(b)  You will maintain, at your expense, any necessary permits and licenses required for your use of the VSAT System.

(c)  After the Start Date, we will provide through HNS the Services during the Term so long as you are not in default under this Addendum or the Agreement.

5.  Support and Maintenance.  After the Equipment is installed and Service commences, we will provide you a toll-free number for reporting VSAT System problems. You will contact the number promptly when and if you experience any problems with the VSAT System, or if any casualty affects the VSAT System. We or HNS will work with you to determine if the problem requires support or maintenance services. The support and maintenance services we or HNS will provide you are listed in Schedule 2 to this Addendum.  You will allow maintenance personnel reasonable access to all areas of the Facility necessary to perform these services.

6.  Monthly Charges.  You will pay to us for the VSAT System a Monthly Service Charge of $150.00 for the period (the "Install Period") beginning on the Start Date and ending at the end of 60 full months after the Start Date, or such lesser amount as we determine to charge all similarly situated licensees in our sole discretion for any subsequent period of time and so notify you in writing.  The "Start Date" is the date the Equipment has been installed at the Facility and the VSAT System begins operating. Charges will begin to accrue on the Start Date. We will invoice you for the Monthly Service Charge in advance each month.  We will charge you a pro-rated amount of the Monthly Service Charge for the portion of a calendar month in which the Start Date occurs if it is not the first day of the month.  You will pay the invoice amount to us upon receipt.  You will also pay any excise, sales, use or other taxes assessed in connection with the VSAT System.  We may apply any amounts received to any outstanding invoices in any order.  We may, after we give you at least 30 days advance written notice, increase the Monthly Service Charge during the term of this Addendum by an amount that reflects the actual price increase to us in the rates HNS charges us for the VSAT System and the cost of providing any related support or maintenance services. If we increase your Monthly Service Charge, we will also apply these increases to all other similarly situated Chain Licensees.

2

7. <u>Term</u>. This Addendum will be effective from the date of execution by you and us and shall continue in full force and effect for a period (the "Initial Term") ending on the last day of the sixtieth (60th) month, starting on the first day of the month following the Start Date (the Term Start Date"), unless earlier terminated in accordance with the terms of this Addendum or the Agreement. At the end of the Initial Term, this Addendum shall renew (a "Renewal Term") on a quarterly basis until either you or we give written notice of termination to the other party at least ninety (90) days before the end of the Initial Term or any subsequent Renewal Term.

8. <u>Software</u>. (a) We assign to you HNS' non-exclusive licenses to use the operating systems in connection with the VSAT System (the "Software"), subject to the conditions and limitations in this Addendum. The Software licenses are found on the packaging of the Equipment. The Software may be used only in conjunction with the VSAT System at the Facility, at no other location, and for the sole purpose of obtaining the Services in connection with the operation of your franchise with us. You may not disclose, reverse engineer, alter, add to, modify or copy the Software for any reason. You may not, directly or indirectly, distribute, sell, assign, transfer, offer, disclose, lease or license the Software to a third party.

(b) Title to and ownership of the Software shall remain with us or those entities that have authorized us to sublicense and use them, free of any claim or right of yours or the holder of any security interest, lien or encumbrance on the Facility or any of your other property. If any person attempts to establish any legal right in the Software, you will promptly notify us in writing.

9. <u>Title to Equipment; Risk of Loss; Insurance</u>. HNS or its designee retains title to the Equipment. You have no right, title, or interest in the Equipment other than as specified in this Addendum. The Equipment is not intended to be a fixture or permanently attached to any real property. You will not allow any security interest, landlord's lien, or any other lien or encumbrance to be placed on or attach to the Equipment. If any person attempts to establish any legal right in or to the Equipment, you will promptly notify us in writing. We or HNS may, at our option, mark, label or otherwise identify the Equipment. You will not remove or deface such identification. You bear the entire risk of loss, theft, damage or destruction of any installed Equipment from any cause whatsoever, unless we or HNS directly caused the loss, damage or destruction. You will promptly notify us if the Equipment is damaged for any reason. You will maintain "all-risk" fire and extended casualty (including any acts of nature such as lightning, wind, rain, snow, flood, fire and hail) insurance for the Equipment during the Initial Term and any Renewal Term of at least $25,000, and you name us, Cendant Corporation, Cendant Finance Holding Corporation, their successors and assigns as additional insureds. You will furnish us, prior to installation of the VSAT System, with a certificate of insurance showing the insurance coverage is in effect, the named insured and additional insureds. You must furnish us with an updated certificate of insurance each year when renewed and every time a change is made in your insurance policy or insurance carrier.

10. <u>Force Majeure</u>. If performance by you, HNS or us is delayed or prevented because of strikes, inability to procure labor or materials, defaults of suppliers or subcontractors, delays or shortages of transportation, failure of power or telephone transmissions, restrictive governmental laws or regulations, weather conditions, or other reasons beyond the reasonable control of the party, then performance of such acts will be excused and the period for performance will be extended for a

3

period equivalent to the period of such delay. Delays or failures to pay resulting from lack of funds will not be deemed delays beyond your reasonable control.

11. <u>No Warranties; Security; Indemnity</u>. (a) WE MAKE NO WARRANTY WHATSOEVER, EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY ABOUT THE VSAT SYSTEM, ITS MERCHANTABILITY, ITS FITNESS FOR ANY PARTICULAR PURPOSE, OR ITS CONFORMANCE TO SPECIFICATIONS OF ANY ORDER OR DOCUMENTATION.

(b) We do not warrant any connection to or transmission over the VSAT System, other than as specified in this Addendum. Your use of any information obtained through the Services is at your own risk. We deny any responsibility for the accuracy or quality of the information obtained through the Services. We do not warrant that the VSAT System will be operate uninterrupted or error-free.

(c) You may not use the VSAT System to take any actions or make any statements that (i) infringe on another party's copyright, patent, trademark, trade secret or other proprietary rights or rights of publicity or privacy; (ii) violate any applicable law, statute, ordinance or regulation; (iii) are defamatory, trade libelous or threatening; (iv) are pornographic or obscene; (v) violate any laws regarding unfair competition, discrimination or false advertising; (vi) result in the distribution of viruses, Trojan horses, worms, time bombs, cancelbots, chain letters or other similar harmful or deleterious programming routines; or (vii) result in the unauthorized entry to any other network, machine or device accessible through the Services. You are responsible for all content transmitted from the VSAT System using the Services.

(d) You are responsible for user access security for the VSAT System, and any unauthorized use of the VSAT System. You must authorize and supervise the users of the VSAT System. We may not provide user access security. However, we and HNS will use reasonable efforts to assist you with detecting and identifying a possible security breach.

(e) We or HNS may, at our sole discretion, institute security controls on the Services to protect the confidentiality, privacy, integrity and availability of your information and our information. These controls include (i) requiring users to utilize unique identification and authorization; (ii) limiting certain levels of access to persons you authorize; (iii) implementing access controls on all data, software or other file-system objects to limit access to only authorized users; (iv) ensuring the integrity of all data stored or processed; and (v) preventing the loss of data processed or transferred.

(f) You acknowledge that the VSAT System is specifically authorized for the Facility's commercial use only, and is not intended for personal Internet use by your personnel or Chain guests. We or HNS may, at our sole discretion, institute filters, screens, traps or other devices on the Services and block certain Internet content from being received at or transmitted from the Facility.

(g) You will indemnify and hold harmless us, our affiliates, successors and assigns and each of the respective directors, officers and employees associated with them against all claims of

4

employees, agents, guests, and all other persons and entities, arising out of your operation, use or non-use of the VSAT System, including any content disseminated from the VSAT System at the Facility. We will not be liable to you or any other person or entity for personal injury, personal loss or property loss, including but not limited to, damage to the Facility, as a result of your operation, use or non-use of the Services and Equipment.

12. Temporary Internet Service. If installation of the VSAT System at the Facility is delayed when your Facility opens as a Chain Facility, you must subscribe, on a temporary basis, to the Internet access service we designate if it offers a local point of presence where the Facility is located. However, in certain locations you may be obligated to pay additional Internet access charges if your usage exceeds certain specified limits. If our designated supplier does not offer service in your area, you must subscribe to another Internet service provider, at your cost, until local Internet access service is available from our designated supplier so you can access our information sources available to licensees over the Internet. You will be responsible for all charges for local access and long distance telecommunications, except the direct charges of any toll-free service we offer.

13. Default; Termination; Attorney's Fees. (a) If you are in default under Section 11(a) of the Agreement, or any one of the events described in Section 11(b) of the Agreement that gives us the right to terminate occurs, or you violate Section 11(c) of this Addendum, or you violate Section 8 of the Addendum, or you are in default under either Sections 2 or 3 of the Addendum, or the Equipment becomes inoperable by your act or omission, or you assign or transfer, or attempt to assign or transfer the Services or Equipment without our consent, except as permitted under the Agreement, then to the extent permitted by applicable law, we shall have the right to suspend the Service and use of the Equipment, while the default remains uncured. Additionally, if you default under this Addendum and do not cure the default within the time permitted, we may, at our option, terminate only this Addendum and not the Agreement, upon written notice to you.

(b) Upon the termination of this Addendum for any reason, you will permit us or HNS reasonable access to Facility to remove the Equipment. YOU EXPRESSLY WAIVE ANY RIGHT TO NOTICE OF OR A HEARING WITH RESPECT TO REPOSSESSION AND CONSENT TO ENTRY INTO THE FACILITY BY US, HNS OUR OR THEIR AGENTS OR REPRESENTATIVES TO REMOVE THE EQUIPMENT WITHOUT JUDICIAL PROCESS. If you fail or refuse to permit the peaceable entry to take possession of any Equipment, you will be liable for rental of the Equipment at the rate of Five Hundred Dollars ($500.00) per week from the date that we first attempt to retake it.

(c) If we terminate this Addendum under Section 13(a), you will pay us "Addendum Liquidated Damages" of One Thousand Dollars ($1,000.00) within 10 days following the date of termination. Addendum Liquidated Damages are paid in place of our claims for lost future Monthly Service Charges under this Addendum and the costs to de-install the Equipment. You and we acknowledge that actual damages are difficult or impossible to ascertain on the Addendum Effective Date, and the amount of the Addendum Liquidated Damages is a reasonable pre-estimate of the damages that will be incurred and is not a penalty. Our right to receive other amounts due under the Agreement and this Addendum is not affected.

5

(d)  The non-prevailing party will pay the costs and expenses, including reasonable attorneys' fees and the expenses, incurred by the prevailing party to enforce this Addendum.

IN WITNESS WHEREOF, the undersigned have executed this Addendum as of the date set forth above.

**WE:**
**Days Inns Worldwide, Inc.**

By:_____

       James D. Darby
       (Vice) President

**YOU, as licensee:**
**Yogi of Norfolk, Inc.**

By_____

      Johnny Steele

6

## SCHEDULE 1
## SERVICES AND EQUIPMENT

The Services are full duplex point-to-multipoint satellite communications between an HNS shared hub (the "Hub") and the Facility. The Services include the following:

1) Provision and operation of the Hub by HNS on a 24 hour per day, 365 day per year basis.

2) Built-in redundancy to ensure a higher level of Service availability in the event of HNS equipment failure.

3) Installation of the Equipment at the Facility.

4) Provision and operation of the space segment of HNS's satellite, including its satellite transponder capacity.

5) Equipment maintenance services specified in Schedule 2 of this Addendum.

The Equipment consists of :

1) DW4010 outdoor satellite antenna, indoor equipment with two ethernet ports, two serial (RS-232) ports, and integrated 40 gigabyte hard drive and caching software license.

2) Ethernet Hub (8 port), including up to 25' of ethernet cabling and connections per device for up to 2 separate devices

3) Anti-icing equipment, where required.

7

**SCHEDULE 2**
**SUPPORT AND MAINTENANCE**

You will receive the following maintenance and support services:

1) <u>Telephone Support</u>.  You may contact HNS' satellite control center 24 hours per day, 365 days per year by calling a toll free telephone access to receive Service support.

2)  <u>Corrective Maintenance</u>.  If HNS determines that the Equipment is not operating properly, HNS will restore the Equipment to good working condition by performing the following corrective maintenance as required:

   a)  Diagnostic testing to determine the existence and cause of the malfunction;

   b)  Removal and replacement of any malfunctioning field replaceable Equipment ;

   c)  Reorientation (repointing) of the antenna subsystem;

   d)  Repair or replacement of Equipment interconnecting cables;

   e)  Reloading initializing instructions and recommissioning;

   f)  Verification of proper operation and completion of service report; and

   g)  Notification to the you, us and the control center that the Equipment has been restored to operational status.

3)  <u>Limitations</u>.  Maintenance services do not include any of the following services:

   a)  Maintenance, repair, or replacement of parts damaged or lost through catastrophe, accident, lightning, theft, misuse, fault, or negligence of the you or causes external to the Equipment, including failure of, or faulty, electrical power or air conditioning, operator error, failure, or malfunction of data communication we or HNS did not provide you, or from any cause other than intended and ordinary use.

   b)  Changes, modifications, or alterations in or to the Equipment by anyone other than HNS or us other than HNS-approved upgrades and configuration changes

   c)  Deinstallation, relocation, or removal of the Equipment or any accessories, attachments, or other devices

8

DAYEXCI 3/03
134334

4) <u>Software Maintenance</u>. HNS will correct reported defects in the Software that cause it not to substantially perform in accordance with its applicable specifications as promptly as commercially reasonable at no cost to Customer.

5)     <u>Software Maintenance Service Limitations</u>.     We and HNS have no responsibility to correct any defects in any Software that are caused by (i) modification of the Software by any person other than us or HNS; (ii) failure to install an update provided by us or HNS within 60 days after we or HNS provide it to you; (iii) misuse or improper installation by you; or (iv) problems in third-party hardware, software, or networking equipment which is manipulated by, interoperates with, or operates in conjunction with the Software.

9

**EXHIBIT E**



Days Inns Worldwide, Inc.
1 Sylvan Way
Parsippany, New Jersey 07054-0278

FRANCHISE ADMINISTRATION

Tel 1-866-582-9104
Fax (973) 496-5345

July 5, 2005

**VIA OVERNIGHT COURIER**

Mr. Piyush Patel
1781 Fleischli Parkway
Cheyenne, WY 82001

Re:    **NOTICE OF TERMINATION** of License for Days® System Unit #4592-13701-1 located in Norfolk, NE ("Facility")

Dear Mr. Patel:

Days Inns Worldwide, Inc. ("we", "our" or "us") understands that Piyush Patel ("you" or "your") relinquished control of the Facility to LaSalle Bank, NA causing the automatic termination of the License Agreement dated October 26, 1992 and assigned January 31, 1997 (the "Agreement"). Accordingly, your license to operate the Facility in the Days System terminated on June 16, 2005 (the "Termination Date").

As a result of your premature termination of the Agreement, you are required to pay Liquidated Damages in the amount of $91,500.00 as provided in Sections 24(F) and 20 of the Agreement. You must also pay Damages of $1,000.00 for early termination of the Addendum to the Agreement for Satellite Connectivity Services (the "Addendum"). The Addendum will also terminate on the Termination Date.

We hope, of course, to resolve this matter amicably and welcome the opportunity to do business with you in the future. If you have any questions concerning the contents of this letter, please feel free to contact Joe Maida, Manager of Settlements, at (866) 582-9104, option 6.

Sincerely,

Kathy Cox
Senior Director
Franchise Administration

Enclosure

cc:    Merrill Lynch Credit Corporation (Lender)
       Joseph R. Kane, Jr.
       Joe Maida

## Property Termination Profile Checklist

Prepared by: Jessica & Elena

Date: 6/24/05

Termination Requested by: _____

| Site Information | |
|---|---|
| Brand | Days Inn |
| Unit # (include entity and sequence #) | 4592-13701-1 |
| Site Address: | 1001 Omaha Ave Norfolk, NE 68701 |
| Number of Approved Guest Rooms: | ~~00000~~ 61 |
| Has the Brand been notified of the pending termination? | ☐ Y  ☐ N  ☑ N/A |
| Did the Brand approve proceeding with termination? | ☐ Y  ☐ N  ☑ N/A |
| Has the Unit filed for Bankruptcy? | ☐ Y  ☑ N |
| If yes, do we have a Stay of Relief for the court to proceed with termination? | ☐ Y  ☐ N  ☑ N/A |
| Termination occurring for: | ☐ $  ☐ QA  ☐ $ and QA  ☑ Transfer |
| For units in AR, MN & WI which are being terminated for QA – Has a re-inspection of the Unit happened? (If not do not proceed with termination) | ☐ Y  ☐ N  ☑ N/A |
| Is the Unit located in a special termination period State? (60 days – CT (NE) & NJ 90 days- AR, DE, MN, MS. MO & WI) | ☑ Y  ☐ N |
| If yes, has the applicable special termination period been given? | ☑ Y  ☐ N  ☐ N/A |
| Has a Collection Action been filed? | ☐ Y  ☑ N |

| License Agreement Information | |
|---|---|
| Effective Date of LA: | ~~Aug. 11, 1989~~ Oct 26, 1992 (& Assigned in Dec 31, 1997) |
| Opening Date (or Commencement Date if sites Transferred or renewed): | Nov. 25, 1992 |
| Expiration Date of LA: | Nov 25, 2012 |
| Pending Termination Date: | 5/31/05 |
| Entity Name and Address (address sending letter to): | Piyush Patel 11200 Rockville Pike Suite 400 Rockville, MD 20852 |
| Is there a Guarantor(s) listed in the LA? | ☑ Y  ☐ N |
| If applicable, list guarantors. | Piyush Patel |
| Is there a Three Party Agreement, Comfort Letter or Lender Notification Agreement? | ☑ Y  ☐ N |
| If applicable, please list Lender name and address | Merrill Lynch Credit Corporation |
| Per the LA, list the United States District Court (USDC). | NY |

Page 1 of 1

| Actual Damages | |
|---|---|
| Is the Unit located in an Actual Damages State? (ND, SD, MN & IN) If no, proceed to the Liquated Damages section. If yes, continue with this section | ☐ Y ☑ N |
| Actual Damages amount: | |
| Please demonstrate how you arrived at this amount. (Also include a print out of AP4) | |

| Liquated Damages | | | |
|---|---|---|---|
| Is the Unit located in an Actual Damages State? (ND, SD, MN & IN) If no, proceed with this section. If yes, proceed to the Actual Damages section. | ☐ Y ☑ N | | |
| Liquated Damages amount: | 91,500 now $122,000 | | |
| List the section of the LA that was used to calculate Liquated Damages | 24(f) 20 | Number of Approved Guest Rooms: | 61 |
| Please demonstrate how you arrived at this amount. | | | |
| Shall not be greater than $91,500 × 61 = $91,500 $\frac{2000}{500}$ × 61 = $201,500.00 (122,000 last 24 months fees but no more than $2000/room. | | | |

| Direcway LDs | |
|---|---|
| Has Direcway been installed?  (Check ACD, Set 7, VSAT Installed) | ☑ Y ☐ N |
| If yes, ensure Direcway LDs are included in document?  ($1,000) | ☑ Y ☐ N |
| | ☑ N/A |

| Outstanding Note Information | |
|---|---|
| Is there an outstanding note amount? (check spreadsheet on K drive & if there is email Finance) | ☐ Y ☑ N |
| If yes, ensure that amount is noted in document & email is attached confirming amount? | ☐ Y ☐ N |
| | ☑ N/A |

| QA Review (Complete if terminating for QA reasons) | | | | | |
|---|---|---|---|---|---|
| Inspection Date (list first inspection failure to recent inspection failure) | Score | Default Letter Date | Type of Default (e.g. 1st, 2nd Non-conformance) | Was the lender notified? | Were the guarantors notified? |
| | | | | ☐ Y ☐ N ☐ N/A | ☐ Y ☐ N ☐ N/A |
| | | | | ☐ Y ☐ N ☐ N/A | ☐ Y ☐ N ☐ N/A |
| | | | | ☐ Y ☐ N ☐ N/A | ☐ Y ☐ N ☐ N/A |
| | | | | ☐ Y ☐ N ☐ N/A | ☐ Y ☐ N ☐ N/A |
| | | | | ☐ Y ☐ N ☐ N/A | ☐ Y ☐ N ☐ N/A |

| AR Review (Complete if terminating for Monetary reasons) | | | |
|---|---|---|---|
| Outstanding Balance as of : | | Last Reported (month/year) | |
| Type of Default Sent (e.g. 1st, 2nd) | Default Letter Date | Was the lender notified? | Were the guarantors notified? |
| | | ☐ Y ☐ N ☐ N/A | ☐ Y ☐ N ☐ N/A |
| | | ☐ Y ☐ N ☐ N/A | ☐ Y ☐ N ☐ N/A |
| | | ☐ Y ☐ N ☐ N/A | ☐ Y ☐ N ☐ N/A |
| | | ☐ Y ☐ N ☐ N/A | ☐ Y ☐ N ☐ N/A |

| Legal Approval | | | |
|---|---|---|---|
| | | | **Attorney Approval** |
| Approved to proceed with Termination & damages calculation correct | ☑ Y | ☐ N | |

| Franchise Administration Approval | | | |
|---|---|---|---|
| | | | **Manager Approval** |
| Approved to proceed with Termination | ☑ Y | ☐ N | |
| FIS Termination Code (Comp. Spec. please fill in) | TRN | | |
| FIS Sub Status Code (Comp. Spec. please fill in) | | | |

### Review of Termination Letter

Categories that are highlighted must be corrected or researched by the Compliance Specialist. The Compliance Specialist must then initial that the correction or research has been completed. The Manager will then counter-initial that correction or research has been completed.

| Category | Yes or No | Manager's Initials | Compliance Specialist's Initials | Counter-Initial's of Manager |
|---|---|---|---|---|
| Has the Entity filed for Bankruptcy? | ☐ Y ☑ N | | | |
| If yes, have we received a Stay of Relief from the Court? (If no, please follow up with Legal before terminating) | ☐ Y ☐ N ☑ N/A | | | |
| Letter addressed to correct person (Legal contact) | ☑ Y ☐ N | | | |
| Correct Entity Name | ☑ Y ☐ N | | | |
| Correct Unit, Entity and sequence # | ☑ Y ☐ N | | | |
| Correct Unit Location | ☑ Y ☐ N | | | |
| Correct Brand throughout document | ☑ Y ☐ N | | | |
| Correct Salutation | ☑ Y ☐ N | | | |
| Correct termination date through out the letter? | ☑ Y ☐ N | | | |
| Is the Facility located in an Actual Damages State? (ND, SD, MN & IN) | ☐ Y ☑ N | | | |
| If yes, has the letter been modified to say actual damages instead of liquated damages? | ☐ Y ☐ N ☑ N/A | | | |
| Is the LD or Actual Damages amount correct? | ☑ Y ☐ N | | | |
| If Direcway has been installed, are the Direcway LDs been included? | ☐ Y ☐ N ☑ N/A | | | |
| Is the correct itemized statement balance reflected in the letter? | ☑ Y ☐ N | | | |
| If there are o/s Notes, is the email attached reflecting current balance? | ☐ Y ☐ N ☑ N/A | | | |
| Is there a Three Party Agreement, Comfort Letter or Lender Notification Agreement? | ☐ Y ☑ N | | | |
| If yes, is the Lender cc'd on the letter? | ☐ Y ☐ N ☑ N/A | | | |
| Is there a Guarantor(s) listed in LA? | ☑ Y ☐ N | | | |
| Is one of the Guarantors the addressee receiving the letter? | ☑ Y ☐ N ☐ N/A | | | |
| If no, is the Guarantor(s) listed in the letter under the carbon copies (cc)? | ☑ Y ☐ N ☐ N/A | | | |
| Revise as noted | ☐ Yes | | | |

Comments:

**Baldwin, Lori**

| | |
|---|---|
| **From:** | Kemper, Phillip |
| **Sent:** | Friday, June 03, 2005 10:59 AM |
| **To:** | Baldwin, Lori |
| **Cc:** | Kemper, Phillip |
| **Subject:** | DI Site # 4592-89285 Norfolk, NE |

Good Morning Lori,

I called the site and they answered as Victorian Inn. I asked the lady who answered the phone if they were a former Days Inn and she acknowledged. She told me that the property was sold on 6/1/05 and is under a new management. Do you want us to restrict the property due to a possible illegal transfer? Please let me know and I will forward the information on to Charlene if restriction is necessary. I hope you have a wonderful day!

Thanks,

Phil

1

**Baldwin, Lori**

| | |
|---|---|
| **From:** | Kemper, Phillip |
| **Sent:** | Tuesday, June 07, 2005 2:24 PM |
| **To:** | Baldwin, Lori |
| **Cc:** | Martin, Charlene |
| **Subject:** | DI Site # 4592-89285 Norfolk, NE |

Good Afternoon Lori,

I just wanted to send a follow-up email to you concerning this site.  I advised Charlene of the status of this account and that there was an illegal transfer that took place.  We have restricted this property due to the situation.  If you have any questions, please let me know.

Thanks,

Phil Kemper

1